UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA                    :

   -v.-                                                    :          S1 15 Cr. 317 (KMW)

DEAN SKELOS and ADAM SKELOS,                :

            Defendants.               :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X


# THE GOVERNMENT'S MEMORANDUM OF LAW
## IN OPPOSITION TO THE DEFENDANTS' PRETRIAL MOTIONS


           PREET BHARARA
United States Attorney for the
Southern District of New York
One St. Andrew's Plaza
New York, New York 10007


Jason A. Masimore
Rahul Mukhi
Tatiana R. Martins
Thomas A. McKay
Assistant United States Attorneys
    -Of Counsel-

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................ ii

PRELIMINARY STATEMENT ........................................................................................... 1

BACKGROUND .................................................................................................................. 2

    A.   Procedural Background................................................................................ 2
    B.   Factual Background ................................................................................... 3
          1.   The Defendants' Solicitation Of Corrupt Payments From Developer-1 ..................... 5
          2.   The Defendants' Solicitation Of Corrupt Payments From The Environmental Technology Company................................................................................ 8
          3.   The Defendants' Solicitation Of Corrupt Payments From The Malpractice Insurance Administrator ................................................................................. 17

ARGUMENT ...................................................................................................................... 20

I.    THE DEFENDANTS' MOTION TO DISMISS COUNTS FOUR AND  SEVEN FAILS . 20

    A.   Applicable Law.......................................................................................... 21
          1.   Standards For Motion To Dismiss An Indictment...................................... 21
          2.   Hobbs Act Extortion and Section 666 ...................................................... 22
    B.   Discussion................................................................................................. 28

II.   DEFENDANTS' SUPPRESSION MOTION SHOULD BE DENIED............................... 38

    A.   There Was a Substantial Basis for Judge Gardephe's Probable Cause Determination .... 38
          1.   Applicable Law..................................................................................... 38
          2.   Relevant Facts..................................................................................... 41
          3.   Discussion........................................................................................... 47
    B.   Judge Gardephe's Necessity Findings Were Also Amply Supported ........................... 52
          1.   Applicable Law..................................................................................... 52
          2.   Relevant Facts..................................................................................... 54
          3.   Discussion........................................................................................... 60
    C.   The Good Faith Exception Applies............................................................... 64

III.  THE DEFENDANTS FAIL TO MAKE A PRIMA FACIE SHOWING OF A RULE 6(E) VIOLATION AND THEIR MOTION FOR A RULE 6(E) HEARING FAILS................. 66

    A.   Relevant Facts........................................................................................... 68
    B.   Applicable Law.......................................................................................... 73
    C.   Discussion................................................................................................. 77
          1.   Defendants Fail To State A Prima Facie Case Of A Rule 6(e) Violation.................. 77
          2.   Defendants Will Not Suffer Any Unfair Prejudice........................................ 86

IV.  THE DEFENDANTS' MOTION FOR A BILL OF PARTICULARS FAILS ................ 88

    A.   Relevant Facts........................................................................................... 88
    B.   Applicable Law.......................................................................................... 91
    C.   Discussion................................................................................................. 92

CONCLUSION................................................................................................................... 99

## TABLE OF AUTHORITIES

**Page**

*Bank of Nova Scotia* v. *United States*,
    487 U.S. 250 (1988)................................................................................................ 74

*Barry* v. *United States*,
    865 F.2d 1317 (D.C. Cir. 1989) ............................................................................ 74

*Blalock* v. *United States*,
    844 F.2d 1546(11th Cir. 1988) ............................................................................ 76

*Boyce Motor Lines, Inc.* v. *United States*,
    342 U.S. 337 (1952).............................................................................................. 21

*Costello* v. *United States*,
    350 U.S. 359 (1956).............................................................................................. 21

*Douglas Oil Co.* v. *Petrol Stops Northwest*,
    441 U.S. 211 (1979).............................................................................................. 73

*Evans* v. *United States*,
    504 U.S. 255 (1992).............................................................................................. 22

*Franks* v. *Delaware*,
    438 U.S. 154 (1978).............................................................................................. 65

*Hamling* v. *United States*,
    418 U.S. 87 (1974)................................................................................................ 21

*Illinois* v. *Gates*,
    462 U.S. 213 (1983)................................................................................... 38, 39, 40

*In re Archuleta*,
    432 F.Supp. 583 (S.D.N.Y. 1977) ....................................................................... 86

*In re Grand Jury Investigation (Lance)*,
    610 F.2d 202 (5th Cir. 1980) .......................................................................... 76, 77

*In re Grand Jury Proceedings*,
    417 F.3d 18 (1st Cir. 2005).................................................................................. 76

*In re Grand Jury Subpoena*,
    920 F.2d 235 (4th Cir. 1990) ...................................................................... 76, 77, 79

*In re Sealed Case No. 98-3077*,
    151 F.3d 1059 (D.C. Cir. 1998)........................................................................... 74

*In re Sealed Case No. 99-3091*,
    192 F.3d 995 (D.C. Cir. 1999)........................................................................ 75, 85

*In re United States*,
    834 F.2d 283 (2d Cir.1987).................................................................................. 99

ii

*Judiciary Comm.* v. *U.S. Dep't of Justice, (SoCPR)*,
823 F.2d 574 (D.C. Cir. 1987) .......................................................................... *passim*

*McNally* v. *United States*,
483 U.S. 350 (1987) .............................................................................................. 22

*United States* v. *Nedza*,
880 F.2d 896, 902 (7th Cir. 1989) ........................................................................ 36

*Spinelli* v. *United States*,
393 U.S. 410 (1969) .............................................................................................. 38

*United States* v. *Alfisi*,
308 F.3d 144 (2d Cir. 2002)................................................................................... 28

*United States* v. *Ambrosio*,
898 F. Supp. 177 (S.D.N.Y. 1995) .................................................................. 39, 65

*United States* v. *Bahel*,
662 F.3d 610 (2d Cir. 2011)................................................................................... 27

*United States* v. *Bellomo*,
954 F. Supp. 630 (S.D.N.Y. 1997) ................................................................. *passim*

*United States* v. *Bencivengo*,
749 F.3d 205 (3d Cir. 2014)...................................................................... 22, 31, 36

*United States* v. *Biaggi*,
853 F.2d 89 (2d Cir. 1988)............................................................................ *passim*

*United States* v. *Bianco*,
998 F.2d 1112 (2d Cir. 1993)........................................................................... 65, 66

*United States* v. *Birdsall*,
233 U.S. 223 (1914)......................................................................................... 24, 29

*United States* v. *Bortnovsky*,
820 F.2d 572 (2d Cir. 1987)................................................................... 91, 93, 98

*United States* v. *Brewer*,
204 Fed. App'x 205(4th Cir. 2006) ...................................................................... 65

*United States* v. *Brewster*,
408 U.S. 501 (1972)............................................................................................... 24

*United States* v. *Burke*,
700 F.2d 70 (2d Cir. 1983).................................................................................... 87

*United States* v. *Carson*,
464 F.2d 424 (2d Cir. 1974)............................................................................. 24, 25

*United States* v. *Carter*,
530 F.3d 565 (7th Cir. 2008) ................................................................................ 29

iii

*United States* v. *Clemente*,
  640 F.2d 1069 (2d Cir. 1981) ...................................................................... 23

*United States* v. *Concepcion*,
  579 F.3d 214 (2d Cir. 2009)....................................................... 38, 53, 54, 62

*United States* v. *Conesa*,
  899 F. Supp. 172 (S.D.N.Y. 1995) ............................................................... 97

*United States* v. *Davidoff*,
  845 F.2d 1151 (2d Cir. 1988)........................................................................ 99

*United States* v. *De La Pava*,
  268 F.3d 157 (2d Cir. 2001)........................................................................ 21

*United States* v. *DeMizio*,
  741 F.3d 373 (2d Cir. 2014)........................................................................ 24

*United States* v. *Diaz*,
  176 F.3d 52 (2d Cir. 1999).......................................................... 39, 41, 51, 53

*United States* v. *Dimora*,
  750 F.3d 619 (6th Cir. 2014) .......................................................... 23, 26, 31

*United States* v. *Dynavac Inc.*,
  6 F.3d 1407 (9th Cir. 1993) .................................................................. 74, 77

*United States* v. *Eastern Air Lines, Inc.*,
  923 F.2d 241 (2d Cir. 1991)................................................................... 76, 77

*United States* v. *Eisen*,
  974 F.2d 246 (2d Cir. 1992)........................................................................ 86

*United States* v. *Fama*,
  758 F.2d 834 (2d Cir. 1985)........................................................................ 50

*United States* v. *Feola*,
  651 F. Supp. at 1091 ............................................................................ 41, 51

*United States* v. *Ferguson*,
  478 F. Supp. 2d 220 (D. Conn. 2007)......................................................... 99

*United States* v. *Ford*,
  435 F.3d 204 (2d Cir. 2006)........................................................................ 36

*United States* v. *Forde*,
  740 F. Supp. 2d 406 (S.D.N.Y. 2010).......................................................... 37

*United States* v. *Friedman*,
  854 F.2d 535 (2d Cir. 1988)........................................................................ 86

*United States* v. *Fury*,
  554 F.2d 522 (2d Cir. 1977)........................................................................ 39

*United States* v. *Gallo*,
  863 F.2d 185 (2d Cir. 1988)................................................................... 40, 41

*United States* v. *Gambino*,
  809 F. Supp. 1061 (S.D.N.Y. 1992) ................................................................................. 22

*United States* v. *Gangi*,
  33 F. Supp. 2d 303 (S.D.N.Y. 1999) ................................................................ 38, 39, 40, 52

*United States* v. *Ganim*,
  510 F.3d 134 (2d Cir. 2007) ....................................................................................... *passim*

*United States* v. *Garcia*,
  992 F.2d 409 (2d Cir. 1993) ........................................................................................... 37

*United States* v. *Gigante*,
  979 F. Supp. 959 (S.D.N.Y. 1997) ....................................................................... 39, 41, 53

*United States* v. *Goldberg*,
  756 F.2d 949 (2d Cir. 1985) ........................................................................................... 21

*United States* v. *Gotti*,
  42 F. Supp. 2d 252 (S.D.N.Y. 1999) ............................................................................... 65

*United States* v. *Green*,
  350 U.S. 415 (1956) ........................................................................................................ 23

*United States* v. *Guerrerio*,
  670 F. Supp. 1215 (S.D.N.Y. 1987) ............................................................................... 92

*United States* v. *Huntress*,
  No. 13-CV-199S, 2015 WL 631976 (W.D.N.Y. Feb. 13, 2015) ..................................... 99

*United States* v. *Hyde*,
  574 F.2d 856 (5th Cir. 1978) ............................................................................. 41, 43, 44, 46

*United States* v. *Jefferson*,
  674 F.3d at 357 ............................................................................................................... 24

*United States* v. *Kahn*,
  415 U.S. 143 (1974) ........................................................................................................ 53

*United States* v. *Kerik*,
  615 F. Supp. 2d 256 (S.D.N.Y. 2009) ............................................................................. 25

*United States* v. *Leon*,
  468 U.S. 897 (1984) ........................................................................................................ 64

*United States* v. *Lilla*,
  699 F.2d 99 (2d Cir. 1983) .................................................................................. 53, 58, 61

*United States* v. *Machado*,
  986 F. Supp. 2d 288 (S.D.N.Y. 2013) ............................................................................. 96

*United States* v. *Magaddino*,
  496 F.2d 455 (2d Cir. 1974) ............................................................................... 39, 54, 56, 57

*United States* v. *Malekzadeh*,
  855 F.2d 1492 (11th Cir. 1988) ...................................................................................... 65

*United States* v. *Marcus*,
  628 F.3d 36 (2d Cir. 2010) ............................................................................. 37

*United States* v. *Margiotta*,
  688 F.2d 108 (2d Cir. 1982)............................................................... 22, 23, 36

*United States* v. *Marino*,
  664 F.2d 860 (2d Cir. 1981)........................................................................ *passim*

*United States* v. *McDonnell*,
  792 F.3d 478 (4th Cir. 2015) .................................................................. 26, 33

*United States* v. *McDonnell*,,
  793 F.3d at 507 .............................................................................................. 26

*United States* v. *McDonough*,
  56 F.3d 381 (2d Cir. 1995).......................................................... 22, 31, 32, 36

*United States* v. *Middlemiss*,
  217 F.3d 112 (2d Cir. 2000)........................................................................... 36

*United States* v. *Miller*,
  116 F.3d 641 (2d Cir. 1997)........................................................................... 53

*United States* v. *Mitlof*,
  165 F. Supp. 2d 558 (S.D.N.Y. 2001)........................................................... 92

*United States* v. *Moore*,
  41 F.3d 370 (8th Cir. 1994) ........................................................................... 65

*United States* v. *Myers*,
  692 F.2d at 840 .............................................................................................. 36

*United States* v. *Myers*,,
  692 F.3d 823 (2d Cir. 1982)........................................................................... 36

*United States* v. *Ordner*,
  554 F.2d 24 (2d Cir. 1977)............................................................................. 37

*United States* v. *Pacheco*,
  902 F. Supp. 469 (S.D.N.Y. 1995) ................................................................ 96

*United States* v. *Payden*,
  613 F. Supp. 800 (S.D.N.Y. 1985) ................................................................ 91

*United States* v. *Percevault*,
  490 F.2d 126 (2d Cir. 1974)........................................................................... 98

*United States* v. *Perez*,
  575 F.3d 164 (2d Cir. 2009).............................................................. 21, 30, 37

*United States* v. *Phillips*,
  843 F.2d 438 (11th Cir. 1988) ...................................................................... 75

*United States* v. *Pirro*,
  212 F.3d 86 (2d Cir. 2000)............................................................................. 29

*United States* v. *Rajaratnam*,
    719 F.3d 139 (2d Cir. 2013)..................................................................... 65, 99

*United States* v. *Reinhold*,
    994 F. Supp. 194 (S.D.N.Y. 1998) ................................................................ 95

*United States* v. *Resendiz-Ponce*,
    549 U.S. 102 (2007)..................................................................................... 21

*United States* v. *Rice*,
    478 F.3d 704 (6th Cir. 2007) ....................................................................... 65

*United States* v. *Rioux*,
    97 F.3d 648 (2d Cir. 1996).................................................................... *passim*

*United States* v. *Rosen*,
    471 F. Supp. 2d 651 (E.D. Va. 2007) ...................................................... 75, 84

*United States* v. *Rosen*,
    716 F.3d 691 (2d Cir. 2013)............................................................. 24, 27, 33

*United States* v. *Rowell*,
    903 F.2d 899 (2d Cir. 1990)................................................................... 41, 50

*United States* v. *Ruggiero*,
    726 F.2d 913 (2d Cir. 1984).......................................................................... 53

*United States* v. *Ruggiero*,
    824 F. Supp. 379(S.D.N.Y. 1993), ............................................................. 40

*United States* v. *Scala*,
    388 F. Supp. 2d 396 (S.D.N.Y. 2005)............................................................ 40

*United States* v. *Stringer*,
    730 F.3d 120 (2d Cir. 2013)......................................................................... 21

*United States* v. *Sun-Diamond Growers of Cal.*,
    526 U.S. 398 (1999)......................................................................... 23, 27, 35

*United States* v. *Sweig*,
    316 F. Supp. 1148 (S.D.N.Y. 1970).............................................................. 86

*United States* v. *Thomas*,
    736 F.3d 54(1st Cir. 2013),........................................................................ 75

*United States* v. *Todisco*,
    667 F.2d 255 (2d Cir. 1981)......................................................................... 51

*United States* v. *Tomero*,
    462 F. Supp. 2d 565 (S.D.N.Y. 2006)............................................................ 65

*United States* v. *Torres*,
    901 F.2d 205 (2d Cir. 1990)......................................................................... 91

*United States* v. *Trippe*,
    171 F. Supp. 2d 230 (S.D.N.Y. 2001)............................................................ 53

*United States* v. *Valle*,
538 F.3d 341 (5th Cir. 2008) .............................................................................. 36

*United States* v. *Vilar*,
729 F.3d 62 (2d Cir. 2013).................................................................................. 21

*United States* v. *Wagner*,
989 F.2d 69 (2d Cir. 1993)............................................................................. 38, 54

*United States* v. *Washington*,
705 F.2d 489 (D.C. Cir. 1983) .......................................................................... 86

*United States* v. *Yannotti*,
541 F.3d 112 (2d Cir. 2008)......................................................................... 38, 39

*United States* v. *Young*,
822 F.2d 1234 (2d Cir. 1987)............................................................................. 53

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA                    :

   -v.-                                                  :          S1 15 Cr. 317 (KMW)

DEAN SKELOS and ADAM SKELOS,          :

             Defendants.                     :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

## THE GOVERNMENT'S MEMORANDUM OF LAW
## IN OPPOSITION TO THE DEFENDANTS' PRETRIAL MOTIONS

The United States of America respectfully submits this Memorandum of Law in

opposition to the defendants' pretrial motions.  For the reasons set forth below, the defendants'

motions are without merit and should be denied in their entirety.[1]

### PRELIMINARY STATEMENT

In their pretrial motions the defendants request that this Court: (i) dismiss two counts of

the Superseding Indictment as a matter of law ("Defs. Mot. to Dimiss"); (ii) suppress evidence

obtained through Title III wiretaps ("Defs. Mot. to Suppress"); (iii) hold a hearing on alleged

violations of Federal Rule of Criminal Procedure 6(e) ("Defs. 6(e) Mot."); and (iv) order the

Government to file a bill of particulars ("Defs. BOP Mot.").  Each of these motions fails.

The charges that the defendants seek to dismiss are well grounded in both fact and law

and comport with Supreme Court and Circuit precedent.  The wiretap evidence they seek to

suppress was obtained through duly authorized Title III applications that set forth overwhelming

---

[1]     The Government is submitting this omnibus response to the defendants' four separate
motions.  The Court's individual rules allow up to 25 pages for memoranda in opposition to a
motion.  Accordingly, the Government has limited this omnibus response to the defendants' four
separate motions to 100 pages.

facts establishing probable cause and the necessity of wiretaps to further the Government's investigation. The defendants' false accusation that the Government disclosed grand jury information is speculative, devoid of specifics, and fails to identify any matter actually presented to a grand jury in the cited press reports or establish that the sources for the matters reported were Government sources. Finally, the defendants' request for a bill of particulars fails because the Government has already provided the defendants with an extraordinary amount of information concerning the Government's allegations—in the Complaint, Superseding Indictment, agent affidavits, and well-organized and electronically searchable discovery, among other ways—and, as such, the defendants are impermissibly seeking precise evidentiary details to which they are not entitled.

In sum, the defendants' motions should be denied in their entirety.

## BACKGROUND

### A.     Procedural Background

The defendants were charged in a 43-page, single-spaced Complaint, dated May 1, 2015 (the "Complaint" or "Compl."), with extortion, soliciting and accepting bribes and gratuities, and honest service fraud offenses related to, among other things, a major real estate development firm ("Developer-1") and an environmental technology company (the "Environmental Technology Company" or the "Company").

On May 28, 2015, a grand jury returned a six-count Indictment against the defendants (the "Indictment"), alleging violations of the same crimes charged in the Complaint. On July 21, 2015, the same grand jury returned an eight-count Superseding Indictment, which added extortion, bribery, and gratuity offenses related to a medical malpractice insurance administrator (the "Malpractice Insurance Administrator"). Count One charges the defendants with conspiring

2

to commit extortion by obtaining property under color of official right, in violation of Title 18, United States Code, Section 1951; Count Two charges the defendants with conspiring to commit honest services wire fraud, in violation of Title 18, United States Code, Section 1349; Counts Three, Four, and Five each charges the defendants with substantive extortion under color of official right, in violation of Title 18, United States Code, Sections 1951 and 2, related to Developer-1 (Count Three), the Environmental Technology Company (Count Four), and the Malpractice Insurance Administrator (Count Five), respectively; Counts Six, Seven, and Eight each charges the defendants with solicitation and acceptance of bribes and gratuities, in violation of Title 18, United States Code, Sections 666(a)(1)(B) and 2, also related to Developer-1 (Count Six), the Environmental Technology Company (Count Seven), and the Malpractice Insurance Administrator (Count Eight), respectively.

**B.     Factual Background**

From in or about 1984 until the present, defendant Dean Skelos has served as a member of the New York State Senate (the "Senate"), representing a Senate District that covers parts of Nassau County.  (Superseding Indictment ¶ 1).  Since in or about January 2011, until on or about May 11, 2015, Dean Skelos was the Majority Leader and/or Co-Majority Leader of the Senate. (*Id.*).  As Majority Leader, Dean Skelos exercised enormous power over the Senate and New York State government.  (*Id.* ¶ 2).  In addition to having the powers common to all State Senators, Dean Skelos appointed the chairs of Senate committees, determined which Senators were listed as the sponsors of legislation, controlled if and when legislation was brought to the Senate floor for a vote, and represented the Senate in negotiations with the Governor and the New York State Assembly concerning the State's budget and other critical legislative and political matters pending before the State.  (*Id.*).  In addition to his power and influence in

3

Albany, Dean Skelos wielded official power and influence in Nassau County, where he was the county's highest ranking State official. (*Id.*). Among other things, Nassau County relied on Dean Skelos to secure legislation important to its governance and the funding of its operations. (*Id.*).

As alleged, from at least in or about 2010 up to and including in or about April 2015, Dean Skelos criminally abused the power of his office in order to obtain payments for his adult son, defendant Adam Skelos. (Superseding Indictment ¶ 8). The payments were secretly solicited by Dean Skelos and Adam Skelos from, among others, Developer-1, the Environmental Technology Company, and the Malpractice Insurance Administrator, each of which had critical legislative interests pending before Dean Skelos. (*Id.* ¶¶ 6-28). The payments solicited and accepted by the defendants included jobs for Adam Skelos for which he was not qualified and often performed little work, other than to attempt to increase his payments through the official actions of his father, defendant Dean Skelos. (*Id.*). In order to bring about and continue these payments, Dean Skelos repeatedly pressured the entities from which he and Adam Skelos wanted money, including during meetings, conversations, and time periods during which the same entities were lobbying Dean Skelos and the Senate to take legislative actions in the entities' favor, and Dean Skelos then took numerous official actions in favor of the entities that agreed to pay his son. (*Id.* ¶¶ 11, 18). Witnesses from Developer-1, the Environmental Technology Company, and the Malpractice Insurance Administrator are expected to testify at trial that they made payments to Adam Skelos in response to demands from Dean Skelos and based on their fear that, if they did not make the payments, Dean Skelos would cease taking official actions in their favor and would take official actions against them. (*Id.* ¶¶ 15, 22).

4

### 1.     The Defendants' Solicitation Of Corrupt Payments From Developer-1

Developer-1 is a large real estate development firm that, through various corporate affiliates, builds, owns, and manages luxury residential rental properties across the New York City metropolitan area. (Superseding Indictment ¶ 4). Developer-1's business model depends in substantial part on a New York State tax abatement program for new building construction commonly called the "421-a" program. (*Id.*). Developer-1's business is also impacted by rent regulation laws, which in New York State are controlled at the State level. (*Id.*). The laws governing 421-a and rent regulation expire every four years, when they must be renewed by the State legislature. (*Id.*). If 421-a and rent regulations laws were not renewed in a manner favorable to Developer-1, Developer-1's entire business would be put at risk. In an internal email, Developer-1's chief lobbyist described these legislative renewals as "existential" for Developer-1.

In or about late 2010 and early 2011, during a period in which Developer-1 actively was lobbying Dean Skelos on the 421-a and rent regulation laws that were set to be renewed in June 2011, Dean Skelos repeatedly pressured representatives of Developer-1 to make payments to Adam Skelos. (Superseding Indictment ¶ 11). Many of these solicitations occurred during the same meetings when Developer-1 was lobbying Dean Skelos on the real estate legislative renewals it was seeking. For example:

- On December 20, 2010, Dean Skelos met with representatives of Developer-1 about the legislative renewals that Developer-1 was seeking during the upcoming session. (Superseding Indictment ¶ 11(a)). Both during and after this meeting, Dean Skelos asked the Developer-1 representatives to send Developer-1's title insurance business to Adam Skelos so that Adam Skelos could receive cash commissions. (*Id.*).

- On March 18, 2011, Dean Skelos met with members of a real estate industry group to discuss the same legislative renewals being sought by Developer-1. (Superseding Indictment ¶ 11(c)). After the meeting ended, Dean Skelos repeated his request that Developer-1 direct title commissions to Adam Skelos. (*Id.*).

5

- On May 5, 2011, Dean Skelos met privately with Developer-1's representatives to discuss what Developer-1 wanted in the real estate legislation renewals. (Superseding Indictment ¶ 11(d)). Dean Skelos reiterated his request that Developer-1 give Adam Skelos business because Adam Skelos was purportedly suffering financially. (*Id.*).

As a result of these repeated demands by Dean Skelos, Developer-1 agreed to find sources of payment for Adam Skelos. Developer-1 did not want the payments to Adam Skelos to be traceable to itself and so it agreed with the defendants that it would arrange for Adam Skelos to be paid by third parties, one of which was the Environmental Technology Company. (Compl. ¶ 29(c)).[2] Specifically, Developer-1 arranged with executives for the Environmental Technology Company for Adam Skelos to be hired as a "government relations" consultant for $4,000 per month even though Adam Skelos had no experience in the Company's field of business. (Superseding Indictment ¶ 14).

In addition to arranging Adam Skelos's contract with the Environmental Technology Company, Developer-1 also arranged for a one-time payment of $20,000 to Adam Skelos at the behest of Dean Skelos, a payment that required no work from Adam Skelos in return. (Superseding Indictment ¶ 16). Specifically, on September 19, 2012, Dean Skelos spoke at a meeting hosted by a real estate industry group and attended by representatives of Developer-1. (Compl. ¶ 29(a)). After his speech, Dean Skelos approached a particular representative of Developer-1 who later became a cooperating witness ("CW-1") and told CW-1 that Adam Skelos needed an immediate payment. (*Id.*). Less than a week later, Dean Skelos followed up on his request with a phone call to Developer-1's chief lobbyist, who then called CW-1. As result of these requests from Dean Skelos, Developer-1 arranged for Adam Skelos to receive a

---

[2]   Developer-1 had longstanding ties to the Company that started when members of the founding family for Developer-1 invested heavily in the company in the late 1990s.

$20,000 payment, which was disguised as a title insurance commission from a third party for which Adam Skelos did no work.  (Superseding Indictment ¶ 16).

As detailed in the Complaint and Superseding Indictment, during the same time period that Dean Skelos extracted promises from Developer-1 to pay Adam Skelos, Dean Skelos took numerous official actions in favor of Developer-1:

- On June 24, 2011, Dean Skelos sponsored and voted for the Rent Act of 2011, which renewed the 421-a program and made modest changes to the rent regulation laws as had been extensively lobbied for by Developer-1.

- On June 5, 2012, Skelos voted for a bill that would have loosened rent regulation, which had been lobbied for by Developer-1.

- On January 23, 2013, Dean Skelos voted for a bill to extend the 421-a program, which had been lobbied for by Developer-1.

- On June 21, 2013, Dean Skelos voted in favor of legislation modifying the 421-a program, which had been lobbied for by Developer-1.

(Compl. ¶ 33(a)-(d)).  In addition to lobbying for particular real estate legislation, Developer-1 actively opposed campaign finance reform, which would have curtailed its ability to access New York State politicians through its extensive political and campaign contribution operation.  In particular, Developer-1 was one of the largest users of the "LLC Loophole" in New York State campaign finance law, which treats LLCs as individuals for purposes of campaign contribution limits and thereby significantly increases the amount that LLCs may legally give to a candidate. Dean Skelos continually opposed campaign finance reform efforts, which would have had an outsized negative impact on Developer-1.

7

2.      **The Defendants' Solicitation Of Corrupt Payments From The Environmental Technology Company**

After the defendants obtained Adam Skelos's contract with the Environmental Technology Company by extorting Developer-1, the defendants turned their sights to extorting the Environmental Technology Company to continue and increase its payments to Adam Skelos.

a.      **The Defendants Facilitate The Approval Of The Company's Nassau County Contract In Exchange For Increased Payments To Adam Skelos**

At the time the Environmental Technology Company began paying Adam Skelos, the Company was actively pursuing contracts in New York State. (Compl. ¶ 36(b)). In particular, the Company was hoping to convince Nassau County to issue a request for proposal ("RFP") for a "design-build" stormwater contract that the Company would be in a unique position to win. (*Id.*).[3]

In November 2012, Adam Skelos signed a two-year consulting contract with the Environmental Technology Company, which guaranteed him a monthly $4,000 fee.[4] Adam Skelos's consulting agreement provided that, if Nassau County awarded the contract to the Company, Adam Skelos's payments would increase to $5,000 per month. (Compl. ¶ 30).

In late 2012 and early 2013, the Environmental Technology Company repeatedly inquired with Adam Skelos as to the status of the Nassau County RFP. (Compl. ¶ 36(c)). As a result of the Company's inquiries, Dean Skelos repeatedly contacted the Nassau County Executive, a political ally who was heavily dependent on Dean Skelos's role as the chief

---

[3]     In sum and substance, a design-build project is one in which the design and construction services are bid out to and contracted with a single entity, which has sole responsibility for designing and building the project. (Compl. ¶ 27(c), n.7).

[4]     Days before Adam Skelos was offered his consulting contract, Dean Skelos had a conference call with a representative of the Company and Adam Skelos during which Dean Skelos advised the Company on how to obtain post-Hurricane Sandy contracts in New York.

advocate for Nassau County's interests at the State level.  On February 22, 2013, the Company

and the defendants successfully caused Nassau County to issue the RFP they had been seeking.

(*Id.*).  On or about April 3, 2013, the Company submitted its bid in response to the RFP, which

was delivered personally by Adam Skelos to the County.  (*Id.* ¶ 36(d)).

On or about April 8, 2013, the Monday after the Environmental Technology Company

had submitted its bid to Nassau County, Adam Skelos called CW-1.  (Compl. ¶ 31(a)).  In sum

and substance, Adam Skelos told CW-1 that he had spoken to Dean Skelos and that both he and

his father agreed that Adam Skelos's payments from the Company should be increased

significantly and, if they were not, Dean Skelos and Adam Skelos would make efforts to ensure

that Nassau County did not approve the Environmental Technology Company's bid.  (*Id.*).

Following this conversation, CW-1 sent an email with the subject "Adam" to the CEO of the

Company with the following message:

> I'm told he's about 45 days away from producing the legislation
> and the RFP to do up to [a] ten million project with you.  He's
> hesitant (and his dad called) to do it with the engineer's [sic]
> making more money than him.  If he doesn't get like a 4%
> commission I think they don't think it's worth pushing through.

(Compl. ¶ 31(b)).  CW-1 also orally reiterated to the CEO the defendants' threat not to push

through the "legislation and the RFP" if Adam Skelos's payments were not increased.  (*Id.*).

One or more witnesses from the Company are expected to testify at trial that they understood the

defendants to be threatening to block their bid for the Nassau County contract through the

official powers and influence of Dean Skelos and that, as result, the Company agreed to increase

Adam Skelos's payments.  Specifically, the Company agreed that if it was awarded the Nassau

County contract, it would increase Adam Skelos's payments to $10,000 month, *i.e.*, twice the

$5,000 per month to which Adam Skelos would have been otherwise entitled under his contract. (Compl. ¶ 31(d)).

After obtaining this promise to pay in response to their threat, the defendants then took further steps to facilitate the approval of the Nassau County contract. On May 28, 2013, in response to a request from the Company, Adam Skelos contacted the Nassau County Attorney and requested that the County write a letter stating that the Company had been awarded the Nassau County contract. (Compl. ¶ 36(f)). Minutes earlier, Dean Skelos had also called the Nassau County Attorney. (*Id.*). On May 30, 2013, two days after Dean Skelos's and Adam Skelos's contacts with the Nassau County Attorney, the Commissioner of the DPW issued an approval to award the Nassau County contract to the Company. (*Id.*).

On July 1, 2013, the Rules Committee of the Nassau County Legislature passed a resolution approving the contract with the Environmental Technology Company, an action that the defendants previously threatened they would not "push through" unless the Company increased payments to Adam Skelos. (Compl. ¶ 36(h)). After the Nassau County Legislature Rules Committee approved the contract, the Company increased Adam Skelos's monthly payments to $10,000. (*Id.*).

Later, in August 2013, the Company requested additional approval documentation from the County to show to its investors. (Compl. ¶ 36(i)). The defendants contacted the County through one of Dean Skelos's closest political allies, and the County provided the Company with the documentation it was seeking. (*Id.*).

10

**b.** **The Defendants Attempt To Increase Payments To Adam Skelos Through Dean Skelos Using His Official Position To Assist the Company in its Attempts to Obtain Fracking-Related Business**

After obtaining the approval of the Nassau County contract with the defendants' assistance, the Company began focusing on obtaining fracking business in New York State. The Company began negotiating a separate agreement with Adam Skelos under which he could earn additional commissions if fracking were approved in New York and the Company obtained fracking-based contracts within the State. (Compl. ¶ 44).

New York State has had an executive moratorium on fracking since 2008. In 2010, Dean Skelos voted for legislation implementing a one-year moratorium on fracking. During the period when Adam Skelos was receiving payments from the Environmental Technology Company, Dean Skelos publicly supported fracking and assisted the Company in its attempts to obtain fracking-related business in the State.

In late 2013, Dean Skelos and Adam Skelos met with Adam Skelos's main point of contact at the Environmental Technology Company, who would later become a cooperating witness ("CW-2"). (Compl. ¶ 44(a)). Before the meeting, Dean Skelos instructed one of his staff members to leave the room so that he could speak to Adam Skelos and CW-2 privately. Once they were alone, Dean Skelos inquired about the Company's plans to financially exploit the State's approval of fracking. (*Id.*). Dean Skelos told CW-2 that, based on Dean Skelos's conversations with the Governor, Dean Skelos believed that the Governor was likely to lift the executive moratorium on fracking after the November 2014 election.

Following the meeting, Dean Skelos instructed his chief of staff to set up a meeting between representatives of the Company and the New York State Department of Health ("DOH"). (Compl. ¶ 44(b)). Another member of Dean Skelos's senior staff repeatedly reached

11

out to DOH about meeting with the Company and, as result, on May 2, 2014, CW-2 and other representatives of the Company met with DOH representatives to advocate for the use of the Company's technology in the event that fracking was approved in New York State.

In the November 2014 election, the Republicans won a majority of the seats in the Senate and Dean Skelos resumed his position as sole Majority Leader. On November 9, 2014, Dean Skelos publicly stated that the approval of fracking was a top priority, even though he had previously voted in favor of a moratorium. On December 12, 2014, Dean Skelos told Adam Skelos that the Governor's DOH Commissioner had started consulting with Senators about the possible approval of fracking, which the defendants believed meant that the Governor would be imminently approving fracking. (Compl. ¶ 44(c)). In Dean Skelos's presence, Adam Skelos spoke on the phone with a lobbyist close to Dean Skelos who had been hired by the Environmental Technology Company and told him to act quickly in setting up additional meetings with the DOH. (*Id.*).

On December 17, 2014, the Governor publicly announced that the fracking moratorium would not in fact be lifted. (Compl. ¶ 45). Dean Skelos and Adam Skelos spoke on the phone immediately following the announcement (AS#942).[5] During the call, Dean Skelos assured Adam Skelos, using coded language, that although the Governor's announcement meant that Adam Skelos would not be able to receive additional commissions from the Environmental Technology Company related to fracking, Dean Skelos would work with Adam Skelos to implement other State legislation so that Adam would continue to profit from stormwater projects:

> Adam Skelos: Ahhh! This day sucks!

---

[5]       "AS#" refers to an intercepted call session on Adam Skelos's phone and "DS#" refers to an intercepted call session on Dean Skelos's phone.

Dean Skelos:  It does.  Well, we're going to totally focus on that other thing now.  Ok?

Adam Skelos:  Yeah.  Oh my god.
. . .
Dean Skelos:  Ok, [a lobbyist] is going to call you.  We're going to refocus on that other stuff, ok?

Adam Skelos:  Alright, alright.  That's good.

**c.     The Defendants Focus On Continuing And Increasing Adam Skelos's Payments From Stormwater Projects After The Governor's Announcement on the Fracking Ban**

True to his word, after the Governor announced he would not be lifting the moratorium on fracking, Dean Skelos "refocus[ed] on that other stuff," meaning continuing and increasing Adam Skelos's payments from stormwater projects pursued by the Environmental Technology Company.  In particular, Dean Skelos used his official position to help the Environmental Technology Company obtain payments from Nassau County as a way of ensuring that Adam Skelos would continue to receive his $10,000 monthly fee from the company.

In order to ensure that the Company continued to pay Adam Skelos, Adam Skelos told the Company that his father was pressuring the County to increase funding and payments to the Company, and Dean Skelos did just that.  For example, on December 2, 2014, Dean Skelos met with the Nassau County Executive.  (Compl. ¶ 42(a)).  Adam Skelos later told CW-2 that during the meeting Dean Skelos had extracted a promise from the County Executive that the Company would receive additional funding.  (*Id.*).

On December 31, 2014, after encountering delays in obtaining the additional funding, Adam Skelos spoke to CW-2 and expressed frustration that Nassau County had not acted promptly enough to pay the Company and assured CW-2 that his father could and would punish Nassau County through his official position if the funds were not released.  (Compl. ¶ 42(b)).

13

On January 3, 2015, Dean Skelos called the Nassau County executive to make arrangements the following day for the two of them to attend the wake and funeral of a NYPD Police Officer killed in the line of duty. (Compl. ¶ 42(d)). During the call, using coded language, Dean Skelos pushed the County Executive to explain why he was funding other county projects instead of funding the Environmental Technology Company. (*Id.*). The County Executive tried to assure Dean Skelos that "everything's fine," but Dean Skelos said that "somebody feels like they're just getting jerked around the last two years. So we'll talk tomorrow." (*Id.*). Dean Skelos immediately reported his conversation to Adam Skelos and the two agreed to meet in person to discuss how Dean Skelos would "iron everything down" with the County Executive at the funeral the next day. (*Id.* ¶ 42(e)).

The next day, outside of the police officer's wake, Dean Skelos asked the Nassau County Executive and the Chief Deputy County Executive about the status of payments to the Company. (Compl. ¶ 42(f)). The Chief Deputy County Executive called another County official and then assured Dean Skelos that the County would pay the Company. (*Id.*). From the funeral, Dean Skelos spoke on the phone with Adam Skelos and told him: "[a]ll claims that are in will be taken care of." (*Id.* ¶ 42(g)). The next day, Adam Skelos told CW-2 that he and his father had gotten an assurance from the County Executive that the Company's contract would receive further funding and that the Company would be paid. (*Id.* ¶ 42(h)). That same day, Nassau County processed an $11,445.34 payment to the Company. (*Id.* ¶ 43).

### d. The Defendants Attempt To Increase Payments To Adam Skelos By Passing New State Legislation

In addition to Dean Skelos taking actions to cause the County to pay additional sums to the Company, the defendants attempted to execute a plan for Dean Skelos to ensure the passage

14

of new State legislation that would further ensure continuation of and potentially increase payments by the Environmental Technology Company to Adam Skelos.

In 2014, Adam Skelos and the Environmental Technology Company were trying to sell the Company's stormwater capabilities to additional municipalities on Long Island. In order to convince the municipalities to agree to contracts with the Company, to realize the full revenue under the Nassau County contract, and to maximize the Company's profits, the Company needed new State legislation that allocated funds for stormwater projects and authorized counties and municipalities to enter into "design-build" contracts. The defendants agreed to use Dean Skelos's official position to try to achieve this goal and Adam Skelos kept the Company informed of their efforts so that his payments would continue.

In late 2014 and early 2015, Dean Skelos began publicly advocating that a portion of New York State's 2015-16 Budget be allocated for stormwater projects like those that would benefit the Company and potentially increase commissions to Adam Skelos. For example, in a press interview published on January 7, 2015, Dean Skelos stated that a portion of the State's so-called surplus funds should be "directed" to stormwater projects. (Compl. ¶ 48(b)). The next day, Dean Skelos discussed Senate business with another State Senator and reiterated to him/her that he was advocating for budget funds to be used for stormwater infrastructure projects. (*Id.* ¶ 48(c)). Dean Skelos also helped craft the Senate Republicans' response to the Governor's State of the State address, which contained language promoting water infrastructure spending that was favorable to the Company's business interests. (*Id.* ¶ 48(d)). When Adam Skelos expressed concern that the Governor planned to allocate the surplus funds in a manner not beneficial to the Company, Dean Skelos assured him that this would be brought up in the Senate's response to the State of the State address.

15

With respect to design-build legislation, on January 15, 2015, Adam Skelos told Dean Skelos he was coming to Albany to promote the legislation by arranging meetings with potential Senate sponsors for the bill.  (Compl. ¶ 50(b)).  In response to Dean Skelos's inquiry concerning which Senators Adam Skelos was meeting with in Albany, Adam Skelos told Dean Skelos that he "was hesitant" to talk about the specifics of his planned meetings over "this cellphone," but that he would tell him in person.  (*Id.*).

### e.    The Defendants Become More Cautious After Charges Are Filed Against The New York State Assembly Speaker And Other Events

The day after the Governor's State of the State Address, on January 22, 2015, the FBI and United States Attorney's Office ("USAO") charged the then-Speaker of the New York State Assembly with corruption offenses related to his outside income from "Of Counsel" positions at two law firms.  (Compl. ¶ 51).  Approximately one week later, a local TV station reported that the USAO was also investigating Dean Skelos based on his own outside income at a different law firm.  (*Id.*).  Two days later, the Governor announced that he would demand that the Legislature enact various ethics reforms before approving a State budget.  (*Id.*).  A combination of these events made the defendants more cautious in having Dean Skelos directly advocate for the interests of the Environmental Technology Company.  (*Id.* ¶ 51(a)-(g)).

With respect to design-build legislation, Adam Skelos told CW-2 that the defendants would attempt to cause the Governor to be the one who proposed design-build legislation during the budget negotiations so that it would not appear that Dean Skelos was behind the proposal, although Dean Skelos would agree to the legislation once it was proposed by the Governor. Specifically, Adam Skelos accurately reported to CW-2 that the Nassau County Executive was seeking design-build authorization in the budget legislation similar to the legislative authorization being sought by the Environmental Technology Company.  (Compl. ¶ 54(a)).  In

16

fact, Dean Skelos had met with County officials about their design-build proposal and Dean Skelos told them that he would support design-build and that the Senate would approve the County's proposal if it were agreed to by the Governor as part of the budget negotiations. (*Id.* ¶ 54(c)). Alternately, if the defendants' plan for the budget negotiations did not work, Adam Skelos told CW-2 that at a later point, when there was less focus on ethics reform, the defendants would arrange for separate "stand-alone" legislation authorizing design-build.

On March 25, 2015, after Adam Skelos informed the Company that, despite his father's efforts, they would be unable to enact the design-build legislation being sought by the Company during the budget process, the Company informed Adam Skelos that it would suspend his payments. (Compl. ¶ 58). After Adam Skelos told Dean Skelos that the Company had decided to stop its payments, Dean Skelos told him "I think you knew it was coming," but told him not to "burn any bridges" and that "we'll try to get it back at some point." (AS#4146). Up until the last days of the budget negotiations, which ended on March 31, 2015, Senate staff working at the direction of Dean Skelos specifically negotiated for allocating budget funds for stormwater projects with the Governor and the Assembly, which would have benefitted the Company.

### 3. The Defendants' Solicitation Of Corrupt Payments From The Malpractice Insurance Administrator

The third scheme charged in the case involves the Malpractice Insurance Administrator, which is one of the largest malpractice insurance providers in New York State. (Superseding Indictment ¶ 7). For many years, the Malpractice Insurance Administrator has been technically insolvent because its outstanding claims exceed its assets. (*Id.*). Nevertheless, New York State has enacted a series of temporary legislative protections that prevents the Malpractice Insurance Administrator from being liquidated. (*Id.*).

17

In 2012, during a time when the Malpractice Insurance Administrator was lobbying Dean Skelos to extend the law preventing its liquidation, Dean Skelos began repeatedly requesting that the Malpractice Insurance Administrator's CEO (the "CEO") direct the company's court-reporting business to Adam Skelos who had a sales commission contract with a court-reporting service. (Superseding Indictment ¶ 18(a)). Later, in August 2012, at a Republican Party fundraising event being hosted by Dean Skelos and others, Adam Skelos asked the CEO for a full-time job. (*Id.* ¶ 18(b)). The CEO agreed to hire Adam Skelos in part because the CEO understood from Dean Skelos's repeated requests relating to the court-reporting service that Dean Skelos wanted the CEO to assist Adam Skelos financially. (*Id.*).

On January 2, 2013, Adam Skelos started getting paid as an employee of the Malpractice Insurance Administrator in its Sales and Marketing Department, even though he did not have a license to sell insurance. (Superseding Indictment ¶ 19). Although under the terms of his contract Adam Skelos was required to work full-time, he regularly failed to report for work starting at the outset of his employment. (*Id.*).

On January 10, 2013, approximately one week after Adam Skelos began as an employee of the Malpractice Insurance Administrator, Adam Skelos's supervisor ("Supervisor-1") called Adam Skelos to set up a meeting to discuss his work schedule given that he had not reported for work for more than one hour during any of the previous four days. (Superseding Indictment ¶ 20). Shortly after that phone call, Adam Skelos called back Supervisor-1 and threatened to "smash in" Supervisor-1's head and stated that Supervisor-1 would "never amount to anything," and that "guys like" Supervisor-1 "couldn't shine [Adam Skelos's] shoes." (*Id.*). On this phone call, and on other occasions, Adam Skelos told Supervisor-1, in and sum substance, that Adam Skelos did not have to come to work regularly because his father was the Majority Leader. (*Id.*).

18

On January 10, 2013, after the conversation between Adam Skelos and Supervisor-1 described above, the CEO received a call from Dean Skelos, who demanded to know why Adam Skelos was being "harassed" by Supervisor-1. (Superseding Indictment ¶ 21). After speaking with Supervisor-1 about the incident, the CEO called Dean Skelos back and told Dean Skelos that Adam Skelos had not been reporting for work, contrary to the terms of his employment, that Adam Skelos had been verbally abusive to Supervisor-1, that Adam Skelos had been telling employees of the Malpractice Insurance Administrator that Adam Skelos was entitled to special treatment because his father was the Senate Majority Leader, and had also been telling other employees that Dean Skelos and the CEO had an arrangement limiting Adam Skelos's expected work hours. (*Id.*). In response, Dean Skelos informed the CEO, in sum and substance, that the CEO needed to resolve any issues that Supervisor-1 might have with Adam Skelos so that Adam Skelos could remain employed at the Malpractice Insurance Administrator. (*Id.*).[6]

Records of defendant Adam Skelos's attendance at work maintained by Supervisor-1 reflect that, from January 2, 2013 through April 26, 2013, Adam Skelos worked for three or more hours only on five days during that approximately four-month period, failing to report for work at all on the vast majority of days. (Superseding Indictment ¶ 24). During this period, Adam Skelos submitted numerous false time sheets falsely affirming that he had worked 35 hours per week. (*Id.*). The CEO continued to employ Adam Skelos at full pay and without disciplining him because of, among other things, the CEO's belief from the January 10, 2013 conversations that Dean Skelos would retaliate with official action against the Malpractice Insurance

---

[6]   Following the January 10, 2013 phone call with Dean Skelos, a lobbyist for the Malpractice Insurance Administrator ("Lobbyist-1") met in person with Dean Skelos for the purpose of discussing with Dean Skelos the fact that defendant Adam Skelos continued to not show up for work. (Superseding Indictment ¶ 23). Dean Skelos informed Lobbyist-1 that Adam Skelos needed money, including because Adam Skelos had recently purchased a house. (*Id.*).

Administrator if Adam Skelos were terminated. (*Id.*). The Malpractice Insurance Administrator never sold one medical malpractice policy as a result of any call placed by or work performed by Adam Skelos. (*Id.*).[7]

During the relevant time period when Adam Skelos was receiving payments from the Malpractice Insurance Administrator at the behest of Dean Skelos, Dean Skelos voted twice (in 2012 and 2015) to extend the temporary legislative protection that prevents the Malpractice Insurance Administrator from being liquidated.

## ARGUMENT

**I.    THE DEFENDANTS' MOTION TO DISMISS COUNTS FOUR AND SEVEN FAILS**

Defendants move to dismiss, as a matter of law, the extortion, bribery, and gratuity counts in the Superseding Indictment that relate to the Environmental Technology Company, *viz.*, Counts Four and Seven. The defendants' motion misconstrues the law and ignores the straightforward factual allegations in the Superseding Indictment. While the defendants' motion challenges what the defendants apparently (and incorrectly) assert is the lack of evidence supporting certain of the charges in the Superseding Indictment, the Government's ability to prove its charges is an issue for the jury to resolve at trial.

---

[7]    In or about the fall of 2013, Adam Skelos approached the CEO about converting his employment to a consulting agreement. (Superseding Indictment ¶ 25). The Malpractice Insurance Administrator offered, and Adam Skelos signed, a consulting agreement for $36,000 per year, in exchange for his agreement to make at least 100 sales calls per week. (*Id.*). The CEO discussed this new arrangement with Dean Skelos. (*Id.*). Adam Skelos did not complete even a small fraction of the required sales calls each week. (*Id.*).

**A.    Applicable Law**

**1.    Standards For Motion To Dismiss An Indictment**

The law is well-settled that "[a]n indictment returned by a legally constituted and unbiased grand jury . . . if valid on its face, is enough to call for trial of the charge on the merits." *Costello* v. *United States*, 350 U.S. 359, 363 (1956).  Accordingly, dismissal of an indictment is an "'extraordinary remedy' reserved only for extremely limited circumstances implicating fundamental rights."  *United States* v. *De La Pava*, 268 F.3d 157, 165 (2d Cir. 2001) (citation omitted).

"Pursuant to Federal Rule of Criminal Procedure 7, 'the indictment or information must be a plain, concise, and definite written statement of the essential facts constituting the offense charged.'"  *United States* v. *Vilar*, 729 F.3d 62, 80 (2d Cir. 2013) (quoting Fed. R. Crim. P. 7(c)(1) (alterations omitted)).  "An indictment is sufficient if it 'first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense.'"  *United States* v. *Stringer*, 730 F.3d 120, 124 (2d Cir. 2013) (quoting *Hamling* v. *United States*, 418 U.S. 87, 117 (1974)); *see also United States* v. *Resendiz-Ponce*, 549 U.S. 102, 108 (2007).  On a pretrial motion to dismiss pursuant to Rule 12(b) of the Federal Rules of Criminal Procedure, the allegations of the indictment must be taken as true.  *See Boyce Motor Lines, Inc.* v. *United States*, 342 U.S. 337, 343 n. 16 (1952); *United States* v. *Goldberg*, 756 F.2d 949, 950 (2d Cir. 1985).

"Unless the government has made what can fairly be described as a full proffer of the evidence it intends to present at trial[,] the sufficiency of the evidence is not appropriately addressed on a pretrial motion to dismiss an indictment."  *United States* v. *Perez*, 575 F.3d 164,

21

166-67 (2d Cir. 2009) (quoting and alteration omitted). Rather, a defendant must wait until after the close of the Government's case-in-chief at trial or after the jury's verdict before contesting sufficiency of the evidence. *See* Fed. R. Crim. P. 29; *United States* v. *Gambino*, 809 F. Supp. 1061, 1079 (S.D.N.Y. 1992).

### 2.    Hobbs Act Extortion and Section 666

The Hobbs Act provides criminal penalties for anyone who "in any way or degree obstructs, delays, or affects commerce . . . by . . . extortion or attempts or conspires to do so." 18 U.S.C. § 1951(a). The Act defines extortion, as is applicable here, as "the obtaining of property from another, with his consent, . . . under color of official right." *Id.* § 1951(b)(2). To establish extortion under color of official right, the Government is required to prove only that a "'public official has obtained a payment to which he was not entitled, knowing that the payment was made in return for official acts.'" *United States* v. *Ganim*, 510 F.3d 134, 145 (2d Cir. 2007) (quoting *Evans* v. *United States*, 504 U.S. 255, 268 (1992)). Under the Hobbs Act, "[t]he public officer's misuse of his office supplies the necessary element of coercion, and the wrongful use of official power need not be accompanied by actual or threatened force, violence, or fear." *United States* v. *Margiotta*, 688 F.2d 108, 130-31 (2d Cir. 1982), *overruled on other grounds by McNally* v. *United States*, 483 U.S. 350 (1987); *see also United States* v. *McDonough*, 56 F.3d 381, 388-90 (2d Cir. 1995) (citing *Margiotta* as valid Circuit precedent on extortion under color of official right post-*McNally*). The public official need not actually take official action on behalf of the extortion victim (or even intend to do so), as long as the extortion victim had a reasonable belief that the public official could influence official action and the defendant was aware that the victim had such a belief. *See, e.g.*, *United States* v. *McDonough*, 56 F.3d at 389 (relying on victim's reasonable belief in defendant state assembly member's control over award of local contracts); *United States*

22

v. *Bencivengo*, 749 F.3d 205, 212-13 (3d Cir. 2014) (affirming Hobbs Act conviction of mayor with no control over school board's contracting decisions because it was reasonable to believe his position gave him influence over school board); *United States* v. *Dimora*, 750 F.3d 619, 627 (6th Cir. 2014) (affirming honest services fraud conviction of county official who had no authority over city officials). Extortion under color of official right does not require that the financial benefit be given to the official who obtained the property using his or her public office. Rather, "[a] Hobbs Act prosecution may lie where the extorted payments are transferred to third parties . . . rather than the public official." *United States* v. *Margiotta*, 688 F.2d at 133; *see also United States* v. *Green*, 350 U.S. 415, 420 (1956) (extortion, as defined in Hobbs Act, "in no way depends upon having a direct benefit conferred on the person who obtains the property"); *United States* v. *Clemente*, 640 F.2d 1069, 1079-80 (2d Cir. 1981) ("[W]hether a Hobbs Act defendant personally receives any benefit from his alleged extortion is largely irrelevant for the purpose of determining guilt under that Act.").

Section 666(a)(1)(B) provides that an agent of a State that receives, in any one year period, benefits in excess of $10,000 under a federal program is guilty of an offense if he "corruptly solicits or demands for the benefit of any person, or accepts or agrees to accept, anything of value from any person, intending to be influenced or rewarded in connection with any business, transaction, or series of transactions of such organization." 18 U.S.C. § 666(a)(1)(B). To establish the corrupt intent element of Section 666 bribery, the Government must prove that the defendant had "'the specific intent to give or receive something of value *in exchange* for an official act.'" *United States* v. *Ganim*, 510 F.3d at 152 (emphasis in original) (quoting *United States* v. *Sun-Diamond Growers of Cal.*, 526 U.S. 398, 404-05 (1999)). Similar to extortion payments, bribery schemes do not require that the public official receive the illegal payments, which may be paid to

23

"family, friends, or others loyal to the [official]."  *United States* v. *DeMizio*, 741 F.3d 373, 382 (2d Cir. 2014) (collecting cases); *see also* 18 U.S.C. § 666(a)(1)(B) (prohibiting soliciting or demanding anything of value "for the benefit of *any person*" (emphasis added)).

Both Hobbs Act extortion and Section 666 charges require that the covered payments be made for "official action."  As the Second Circuit has repeatedly observed, an official action "generally includes any act taken 'under color of official authority.'"  *United States* v. *Rosen*, 716 F.3d 691, 700 (2d Cir. 2013) (quoting *Ganim*, 510 F.3d at 142 n.4).  It has long been the case that an "official action" need not be "prescribed by statute," but rather includes any action "clearly established by settled practice."  *United States* v. *Birdsall*, 233 U.S. 223, 231 (1914); *see United States* v. *Jefferson*, 674 F.32d 332, 352–53 (4th Cir. 2012) (*Birdsall* still good law); *see also United States* v. *Brewste*r, 408 U.S. 501, 524 (1972) (noting in the context of prosecution of United States Senator that "the realities of the American political system" are that "many non-legislative activities are an established and accepted part of the role of a Member" of Congress).  Relying on *Birdsall*'s definition of official action, the Second Circuit has rejected as "untenable" the argument that a legislator's only "official acts" are acts in the legislative process itself.  *United States* v. *Biaggi*, 853 F.2d 89, 97 (2d Cir. 1988);[8] *accord United States* v. *Jefferson*, 674 F.3d at 357 ("an official act need not be prescribed by statute, but rather may include acts that a congressman customarily performs, even if the act falls outside the formal legislative process"); *United States* v.

---

8       *Biaggi* was prosecuted under Title 18, United States Code, Section 201, the statute that applies to bribery of Members of Congress.  Section 201 defines "official act" as "any decision or action on any question, matter, cause, suit, proceeding or controversy, which may at any time be pending, or which may by law be brought before any public official, in such official's official capacity, or in such official's place of trust or profit."  18 U.S.C. § 201(a)(3).  The Hobbs Act and Section 666 do not similarly define official act, *see* 18 U.S.C. §§ 666, 1951, as the Second Circuit specifically noted in *Ganim*, 510 F.3d at 142 n.4 (in case involving Hobbs Act and Section 666 charges, using "official act" to refer to "an act taken under color of official authority, not necessarily as the term is used and statutorily defined in 18 U.S.C. § 201 or elsewhere").

*Carson*, 464 F.2d 424, 433 (2d Cir. 1974) ("There is no doubt that federal bribery statutes have been construed to cover any situation in which the advice or recommendation of a Government employee would be influential, irrespective of the employee's specific authority (or lack of same) to make a binding decision.").

Under this standard, Courts in this Circuit have consistently held that non-legislative acts, including efforts to influence decisions made by agencies, local municipalities, or other government entities not under the defendant's official control, constitute official action. In *Biaggi*, the Second Circuit held that a United States Congressman engaged in official acts when he wrote letters on his congressional stationary on behalf of a party who had paid for his vacations, and urged federal and city officials to take action favorable to that party. 853 F.3d at 97-98. The court held that there is "no basis for ruling that a congressman's official acts—especially those 'demonstrating Congressional interest'—may not include efforts that are directed toward local rather than federal officials." *Id.* at 99. Similarly, in *Carson*, the Second Circuit upheld the conviction of a legislative aide who "as part of his job . . . would exert influence on various agencies and branches of Government." 464 F.2d at 434. Even assuming the aide's actions were a "personal frolic of his own," the court held they would nonetheless constitute official actions because "the primary source of any conceivable influence . . . was the official position held by [the aide]." *Id. See also United States* v. *Kerik*, 615 F. Supp. 2d 256, 263-65 (S.D.N.Y. 2009) (commissioner of city agency used status to vouch for company in connection with investigation being conducted by three independent agencies not under his control).

Courts in other circuits are in accord. For example, in *United States* v. *Gee*, the defendant was convicted of conspiring with the Wisconsin state senate majority leader to pay him kickbacks on state contracts held by the defendant's business. 432 F.3d 713, 714 (7th Cir. 2005). In

25

rejecting the defendant's argument that the state senate majority leader could not influence the award of contracts, which was an executive branch prerogative, the court explained that a "legislator with the ability to control the senate's agenda can throw a monkey wrench into a Governor's program, and this power confers influence over executive decisions even when the legislature does not pass any particular law."  *Id.* at 715; *accord United States* v. *Dimora*, 750 F.3d at 627  (affirming honest services fraud conviction of county official who had no authority over city officials but had considerable influence over relevant decisions because "[h]is votes as commissioner could loosen (or tighten) the county's municipal-funded purse string").  And the Fourth Circuit recently affirmed the honest services and Hobbs Act convictions of the former Governor of Virginia who, in exchange for payments, asked a staffer to attend a briefing, questioned a university researcher at a product launch, directed a policy advisor to "see" him about an issue, and discussed the payor's product at a meeting with other administration officials.  *United States* v. *McDonnell*, 792 F.3d 478, 517 (4th Cir. 2015).[9]

For both extortion and bribery, the Government is not required to prove that any specific official acts are actually carried out in return for the payment.  *See Ganim*, 510 F.3d at 142-43. Rather, the Second Circuit has made "crystal clear" that the extortion and bribery statutes criminalize "schemes involving payments at regular intervals in exchange for specific official acts as the opportunities to commit those acts arise, even if the opportunity to undertake the requested

---

[9]     Defendants argue that *Sun-Diamond* requires a narrow reading of "official action."  (*See* Defs. Mot. to Dismiss 10).  But as the Fourth Circuit has explained, the "dicta" in *Sun-Diamond* did not overrule *Birdsall*'s holding that official action includes settled practices of public officials, which include "speaking with aides and arranging meetings."  *See United States* v. *McDonnell*, 793 F.3d at 507-08.  The Court's point in *Sun-Diamond* was simply that certain acts of a "strictly ceremonial or educational nature will rarely, if ever, fall within" Section 201's definition of "official act" unless those acts "have the purpose or effect of exerting some influence" on the official business at hand.  *Id.* at 508-09; *see also United States* v. *Alfisi*, 308 F.3d 144, 151 n.4 (2d Cir. 2002) ("We do not agree that *Sun-Diamond* requires us to define the crime of bribery narrowly.").

act has not arisen, and even if the payment is not exchanged for a particular act but given with the expectation that the official will exercise particular kinds of influence." *United States* v. *Rosen*, 716 F.3d at 700 (internal quotations and alterations omitted). "Once the quid pro quo has been established, . . . the specific transactions comprising the illegal scheme need not match up this for that." *Ganim*, 510 F.3d at 147. Thus, as long as a "particular payment is made in exchange for a *commitment* to perform official acts to benefit the payor in the future" the requisite *quid pro quo* exists. *Id.* (emphasis in original). "While it frequently will be true that particular bribes or extorted payments are linked at the time of the corrupt agreement to particular official acts, that will not always be the case—for example, because the opportunity to undertake the requested act has not arisen, or because the payment is one of a series to ensure an ongoing commitment to perform acts to further the payor's interests." *Id.*

In contrast to extortion and bribery payments, which do not need to be linked to specific official acts, the Supreme Court held that an illegal *gratuity* must be linked to a specific official action. *See United States* v. *Sun-Diamond Growers of Cal.*, 526 U.S. at 414.[10] The reason is that unlike extortion and bribery payments, a gratuity does not require showing a *quid pro quo* of payment *in exchange* for an official act. *Id.* at 404-405; *see also United States* v. *Bahel*, 662 F.3d 610, 635 (2d Cir. 2011). Rather, an illegal gratuity "may constitute merely a reward for some future act that the public official will take (and may already have determined to take), or for a past act that he has already taken." *Sun-Diamond Growers of Cal.*, 526 U.S. at 405. The requirement of a link to a specific official act is not needed as a limiting principle in the extortion and bribery contexts "because it is the requirement of an intent to perform an act in exchange for a benefit— i.e., the quid pro quo agreement—that distinguishes those crimes from both legal and illegal

---

[10]    The Second Circuit has confirmed that Section 666 prohibits receipt of illegal gratuities as well as bribes. *See Ganim*, 510 F.3d at 150.

gratuities." *Ganim*, 510 F.3d at 146-47 (citing *United States* v. *Alfisi*, 308 F.3d at 149-52 (declining to extend *Sun-Diamond*'s holding to bribery under 18 U.S.C. § 201(b)(1)(A) which contains the element of a *quid pro quo* or a direct exchange)).

**B.      Discussion**

The Superseding Indictment describes in detail the defendants' solicitation and receipt of more than a hundred thousand dollars of extortion, bribery, and gratuity payments from the Environmental Technology Company over the course of almost three years.  Specifically, Count Four alleges that "DEAN SKELOS, the defendant, while serving as an elected legislator and as Majority Leader, Co-Majority Coalition Leader, and President Pro Tem of the New York State Senate, together with ADAM SKELOS, the defendant, willfully and knowingly, attempted to and did commit extortion . . . [of] the Environmental Technology Company," and Count Seven alleges that "DEAN SKELOS, the defendant, being an agent of a State and local government, to wit, a Member of the New York State Senate, and defendant ADAM SKELOS, as an aider and abettor of DEAN SKELOS, knowingly and corruptly" solicited, demanded, accepted, and agreed to accept bribes and gratuities from the Environmental Technology Company.  (Superseding ¶¶ 39, 45).  The Superseding Indictment identifies the things of value that the Company provided, (*id.* ¶ 8(c)), official acts that Dean Skelos performed in exchange for those things of value, (*id.* ¶ 27(d)-(g)), and a detailed description of the manner and means Dean and Adam Skelos employed in obtaining the payments from the Company, (*id.* ¶¶ 11-16).  Accordingly, the allegations more than satisfy the pleading requirements for the charged crimes.  *See* Fed. R. Crim. P. 7(c)(1) ("The indictment or information must be a plain, concise, and definite written

statement of the essential facts constituting the offense charged and must be signed by an attorney for the government.").[11]

The defendants' motion begins with the premise that extortion and bribery charges must allege completed legislative official action to make out the necessary *quid pro quo*. (*See* Defs. Mot. to Dismiss 6-7). This premise is legally incorrect in two fundamental respects. First, as explained, the Supreme Court and the Second Circuit have repeatedly held that "official action" extends beyond legislative action. Rather, official action includes acts that have been clearly established "by settled practice" as part of a public official's position, even if the action was not taken pursuant to responsibilities explicitly assigned by law. *Birdsall*, 233 U.S. at 231; *see Biaggi*, 853 F.2d at 97 (rejecting as "untenable" argument that "official acts" are only acts in the legislative process). Second, the Government is not required to prove that any specific official acts were actually completed or carried out in return for an extortion or bribery payment. *See Ganim*, 510 F.3d at 142–43; *United States* v. *Carter*, 530 F.3d 565, 574 (7th Cir. 2008) ("[T]he Hobbs Act's application is not dependent upon the success of the public official in carrying out his promised acts."). Rather, as long as a "particular payment is made in exchange for a *commitment* to perform official acts to benefit the payor in the future," the requisite *quid pro quo* exists. *Ganim*, 510 F.3d at 147 (emphasis in original).[12]

In addition to its misunderstanding of the Hobbs Act and Section 666, the defendants' motion to dismiss fails because whatever the evidentiary basis for the official actions alleged in

---

[11]    Thus, the authority the defendants cite as alleged support for their position is inapposite. (Defs. Mot. to Dismiss at 4-5) (citing *United States* v. *Pirro,* 212 F.3d 86, 91-95 (2d Cir. 2000) (indictment failed to identify statement in tax return which was allegedly materially false)).

[12]    With respect to gratuities, which do require a link between a payment and a specific official action, the Superseding Indictment identifies the payments and the official actions for which the Government alleges the defendants were rewarded. (*See* Superseding Indictment ¶¶ 8(c), 27(d)-(g)).

29

the Superseding Indictment, there can be no question that the allegations themselves are sufficient. The Government has not purported to make "a full proffer of the evidence it intends to present at trial" of Dean Skelos's official actions, which means the defendants' challenge to the sufficiency of the evidence must wait until trial. *United States* v. *Perez*, 575 F.3d at 166-67. In any event, as set forth below, the facts proffered thus far by the Government, many of which are detailed in the Complaint and Superseding Indictment, reflect numerous official acts that Dean Skelos agreed to perform as part of the extortion, bribery, and gratuity schemes involving the Company.

*First*, the Superseding Indictment alleges that Dean Skelos facilitated the approval of the Environmental Technology Company's contract with Nassau County and pressured Nassau County to fund and pay amounts under the contract in exchange for payments to Adam Skelos. (Superseding Indictment ¶ 27(d)-(e)). Among other things, as detailed in the Complaint, once the Company began paying Adam Skelos, Dean Skelos repeatedly contacted the Nassau County Executive about the RFP the Company was seeking. Later, Dean Skelos and Adam Skelos used CW-1 to transmit a threat that they would not "produc[e] the legislation" and the RFP unless the Company agreed to increase its payments to Adam Skelos. (Compl. ¶ 31(b)). After the Company agreed to the demand, Dean Skelos contacted the County Attorney at the same time Adam Skelos was seeking approval of the Company's bid for the contract, and two days later the Company was notified that it had won the contract. (*Id.* ¶ 36(f)). Two months later, when the Company wanted a further written assurance that its contract would be approved by the County legislature and NIFA, Dean Skelos caused a close political ally to reach out to the County to obtain the document for the Company. (*Id.* ¶ 35(i)). Once the contract was approved, Dean

30

Skelos repeatedly pressured Nassau County officials to fund the Contract and pay the Company's claims. (*Id.* ¶¶ 40-42).

In arguing that this conduct does not constitute official action, characterize Dean Skelos's acts as merely "monitoring the status of a project" and "substantially less than acts that this Circuit has determined constitute 'official acts' for purposes of the federal bribery laws." (Defs. Mot. to Dismiss 11-12). Both characterizations are wrong. Notably, the defendants completely ignore the Government's allegation that they threatened to block "legislation" and the RFP if the Company did not increase its payments to Adam Skelos. (Compl. ¶ 31(b); Superseding Indictment ¶ 14). Even under the defendants' crabbed reading of official action, a threat to block legislation unless a payment is made meets each of the *quid pro quo* elements of extortion and solicitation of bribes and/or gratuities.[13] If the jury credits the Government's allegation that the defendants participated in this threat to the Company, that would in and of itself be sufficient evidence to convict them.

Even beyond this specific threat to take official action as defendants themselves define the term, Dean Skelos's agreement to facilitate the approval of the Company's contract with Nassau County, and funding and payments thereunder, constitutes official action. The Government expects to introduce evidence at trial that it is a settled practice of State legislators like Dean Skelos to inquire about municipal projects and contracts in order advocate for their

---

[13]   The fact that Dean Skelos was not a Nassau County legislator is irrelevant to whether his threat to block the "legislation" constitutes official action because, as numerous courts have held, a public official need not have *de jure* power to perform a given act, so long as it was reasonable to believe that he had the *de facto* power to perform the requested act or the ability influence the public officials charged with doing so. *See, e.g.*, *McDonough*, 56 F.3d at 389; *United States* v. *Bencivengo*, 749 F.3d at 212-13; *Dimora*, 750 F.3d at 627; *United States* v. *Nedza*, 880 F.2d 896, 902 (7th Cir. 1989) (victim was reasonable in believing state senator could affect local business because one senator "testified that state senators exercise enormous influence in areas outside the scope of their traditional duties").

advancement. The Second Circuit has repeatedly found such conduct to rise to the level of official action. *See, e.g.*, *United States* v. *McDonough*, 56 F.3d at 389 (defendant, a state assembly member, could use position as Chairman of Rensselaer County Democratic Committee to control or influence local officials in award of town insurance contracts); *Biaggi*, 853 F.2d at 99 (holding that congressman's efforts to influence city matters were official acts and relying on testimony that "it was not unusual for a congressman to intercede for a constituent on city matters"). The Government's allegations go well beyond Dean Skelos "monitoring the status" of the Company's contract and, nevertheless, the Government expects to prove at trial that even "monitoring the status" of a relatively low priority municipal project by the State's Senate Majority leader, and the highest ranking State official within the municipality, was understood by local officials as a request by Dean Skelos, in his official capacity, that the County accede to requests being made by the Company.[14]

*Second*, the Superseding Indictment alleges that Dean Skelos assisted the Environmental Technology Company in its ultimately unsuccessful attempt to secure the issuance of certain fracking regulations, including by directing members of his staff to arrange a meeting between the Company and the Department of Health. (Superseding Indictment ¶ 27(f)). The Government will introduce evidence at trial that it is a settled practice of State legislators to assist private parties in obtaining meetings with Executive agencies. Dean Skelos's actions on this front bear striking resemblance to the facts of *McDonnell*, where one of the official acts the Governor of

---

[14]   As set forth above, the Government does not allege that the bid on the Nassau County contract was "rigged," meaning the Government does not allege that the Company was unqualified to win the contract. Rather, the illegality alleged in the bidding process arises from the demand by the defendants to increase Adam Skelos's payments on the penalty of interfering with the Company's bid if it did not agree to do so, as well as the steps that Dean Skelos took to facilitate the approval of the Company's bid by causing the RFP to be issued and to issue the approval documents to the Company once the Company agreed to pay Adam Skelos.

Virginia agreed to perform for the payor was to arrange for the Secretary of Health to send a staffer to a briefing with the Governor's wife about the payor's product.  *See McDonnell*, 792 F.3d at 516.  The defendant argued that this did not amount to a "decision" or "action" on a pending matter under Section 201's definition of official action.  *Id.*  The Fourth Circuit rejected this argument, holding that by setting up the meeting with the Department of Health, the Governor had "exploited the power of his office in furtherance of an ongoing effort to influence the work of state university researchers" who the payor wanted to study his product.  *Id.* at 517. Similarly, in *Biaggi*, a congressman wrote a letter to the city mayor stating "my presence or the presence of a member of my staff during meetings between [the relevant entities] might be helpful in demonstrating Congressional interest."  853 F.2d at 92.  The Second Circuit held that a congressman's "invocation of his position and of congressional interest in his intercession with others on behalf of a constituent" constitutes an official act.  *Id.* at 98.

Dean Skelos's conduct in setting up a meeting between the Company and the Department of Health meets any definition of official action.  Using his senior staff to set up the meeting with a State agency shows his conduct was "under color of official authority," which is the applicable standard in this Circuit in an extortion and Section 666 case.  *See Rosen*, 716 F.3d at 700 (quoting *Ganim*, 510 F.3d at 142 n.4).  Even under the Section 201 definition, Dean Skelos's conduct was related to a decision or action on a pending matter before the State, *i.e.*, the review of fracking and the Company's efforts to advocate for regulations that would favor its technology.  *See McDonnell*, 792 F.3d at 517; *Biaggi*, 853 F.2d at 98.

*Finally*, the Superseding Indictment alleges that Dean Skelos agreed to attempt to secure changes to New York State's 2015-2016 budget to include additional funding for stormwater

33

infrastructure projects and changes to New York State Law that would have authorized design-build contracts.  Among other things, the Government expects to introduce evidence that:

- Dean Skelos publicly advocated for budget funds to be allocated for stormwater projects.

- Dean Skelos helped craft another Senator's speech to advocate for budget allocations to water projects.

- Dean Skelos's staff tried to ensure that certain infrastructure funds in the budget would cover stormwater projects.

- Dean Skelos supported design-build legislation within his Senate conference.

- Dean Skelos agreed that if the Governor proposed the design-build legislation the Company was seeking he would support its enactment as part of the budget.

- Dean Skelos agreed to introduce stand-alone design-build legislation if the opportunity arose.

Defendants appear to agree that such conduct, which fell within Dean Skelos's legislative authority, constitutes official action.  Nevertheless, the defendants argue that the allegations are insufficient because the Government disclosed to the defense that certain individuals interviewed over the course of the investigation did not observe Dean Skelos take any steps to enact the budget and design-build legislation being sought by the Company.  (Defs. Mot. to Dismiss 6-7).  Although the Government made early disclosure of certain witness statements consistent with (and indeed beyond) its discovery obligations, the Government did not purport to provide the defendants with a "full proffer" of its evidence on this subject.  The defendants falsely assume that the fact that certain witnesses said they did not observe Dean Skelos promote the Company's legislative agenda during the budget process means that he did not do so.  To the contrary, the Government intends to introduce evidence at trial that will show that Dean Skelos did in fact agree to take such legislative steps, including statements by Dean Skelos and Adam Skelos themselves, testimony of Senate staffers, and Senate documents.

34

Although the defendants point out that Dean Skelos was ultimately not successful in completing the legislation before their arrest, that fact hardly undermines the Government's allegations. Dean Skelos clearly took some official actions to promote the legislative agenda of the Environmental Technology Company, and his inability or even (as the defendants would have it) unwillingness to enact the Company's full legislative agenda after the Assembly Speaker was arrested and reports surfaced that he was himself under investigation does not negate the earlier official acts. Indeed, the Government need not prove that Dean Skelos took any official actions at all (though he did) because proof of a *quid pro quo* agreement is sufficient, regardless of whether specific official acts were actually carried out in return for an extortion or bribery payment. *See Ganim*, 510 F.3d at 142–43. As long as a "particular payment is made in exchange for a c*ommitment* to perform official acts to benefit the payor in the future" the requisite *quid pro quo* exists. *Id.* at 147 (emphasis in original). For the illegal gratuities, payments may be a "reward" for some action to be taken in the future, and here the facts support that the payments to Adam Skelos were made to reward Dean Skelos's future enactment of the legislation the Company was seeking, among other things. *See Sun-Diamond Growers of Cal.*, 526 U.S. at 405 (an illegal gratuity "may constitute merely a reward for some future act that the public official will take (and may already have determined to take)").

Indeed, with respect to the extortion counts, the Government is not required to prove that Dean Skelos ever *actually* intended to undertake official acts for the Environmental Technology Company, just that he extracted payment from the Company knowing that it believed he would. It is settled that in order to prove extortion under color of official right, "'the government must prove beyond a reasonable doubt that the victims were motivated to make payments as a result of the defendant's control or influence over public officials and that the defendant was aware of this

35

motivation.'  The victim's belief that the defendant was able to influence official action must be

reasonable."  *United States* v. *Middlemiss*, 217 F.3d 112, 117 (2d Cir. 2000) (quoting

*McDonough*, 56 F.3d at 388).  Thus, the Government need not prove that the public official

*actually* intended to be influenced, as long as the extortion victim had a reasonable belief that the

public official could influence official action and the defendant was aware that the victim had

such a belief.  *See, e.g.*, *McDonough*, 56 F.3d at 389; *Bencivengo*, 749 F.3d at 212-13; *Nedza*,

880 F.2d at 902.  In this case, the Government expects that the evidence at trial will show that the

Environmental Technology Company had a reasonable belief that Dean Skelos could influence

official action in exchange for the payments to Adam Skelos, and the defendants were aware of

that belief and took steps to cultivate it.  These facts would satisfy every element of extortion

under color of official right—whether or not Dean Skelos intended to make good of his end of

the corrupt bargain.  *Cf. United States* v. *Myers*, 692 F.3d 823, 842 n.19 (2d Cir. 1982) (rejecting

the "bizarre" defense to Section 201 bribery that "the bribe-taker did not intend to keep his

corrupt promise").[15]  Accordingly, if facts are introduced at trial from which the jury could infer

---

[15]     In contrast, the Government does not intend to argue that such conduct, alone, would make out the Section 666 charge contained in Count Seven because that statute, unlike the Hobbs Act, specifically requires an "inten[t] to be influenced or rewarded."  *United States* v. *Ford*, 435 F.3d 204, 213 (2d Cir. 2006); *see id.* at 213-14 nn. 5 & 6 (distinguishing Section 201 bribery from Section 666 from Hobbs Act extortion).  *But see United States* v. *Myers*, 692 F.2d at 840-41 (playacting not a defense to Section 201 bribery); *United States* v. *Valle*, 538 F.3d 341, 347 (5th Cir. 2008) (same); *id.* at 352 (Wiener, J., dissenting) (disagreeing with *Valle*'s holding on Section 201, but noting that "on precisely the same set of facts[ the defendant] was appropriately convicted of extortion under 18 U.S.C. § 872" because of the "difference in the intent elements of bribery and extortion").  The defendants point out that, under Section 2(a) aiding and abetting, Adam Skelos can only be found guilty of the substantive extortion and Section 666 charges if Dean Skelos committed the offenses as the public official.  (Defs. Mot. To Dismiss 7, n.7). However, Adam Skelos is also charged under Section 2(b), under which he can be found guilty of willfully causing a public official to commit the charged offenses regardless of the public official's knowledge.  *See Margiotta*, 688 F.2d at 133 ("While the lack of awareness on the part of the public officials may have relieved them of criminal liability for extortion under color of official right, it does not relieve Margiotta of criminal responsibility, for, pursuant to 18 U.S.C. s

that Dean Skelos participated in obtaining payments from the Environmental Technology Company, knowing that Adam Skelos was in part misrepresenting official actions that Dean Skelos would or would not take in exchange for those payments, those facts would be more than sufficient to establish the necessary *quid pro quo* for extortion under color of right as charged in Count Four of the Superseding Indictment.[16]

In sum, the question of whether the Government's allegations support the charges in the Superseding Indictment is one for the jury. *See Perez*, 575 F.3d at 166-67. The Superseding Indictment is well-pled and the factual proffer made by the Government only further buttresses the Government's allegations. The defendants' motion to dismiss should be denied.[17]

---

2(b), he could be found guilty of having caused the public officials unknowingly to use their power of office in such a manner that would induce the payments"); *United States* v. *Ordner*, 554 F.2d 24, 29 (2d Cir. 1977) (holding that it is "well recognized that the guilt or innocence of the intermediary under a § 2(b) charged is irrelevant") (collecting cases).

[16]     The defendants' reliance on *United States* v. *Garcia*, 992 F.2d 409 (2d Cir. 1993), is misplaced. *Garcia* reversed the extortion convictions of a former congressman and his wife because the district court failed to instruct the jury that the Government must prove a *quid pro quo*. *Id.* at 414-15. As set forth above, the Government agrees that a *quid pro quo* for official action is an element of extortion. There is no tension between this holding and the fact that "play acting" would not be a defense if the requisite *quid pro quo* was shown that Dean Skelos and Adam Skelos understood that payments were being made to Adam Skelos by the victims based on a reasonable belief that the payments were in exchange for Dean Skelos's official action.

[17]     The Court should also deny the defendants' alternative request that the Court inspect the grand jury minutes to "ensure the validity of the Superseding Indictment." (Defs. Mot. to Dismiss 15). Given the applicable law, the facts alleged by the grand jury in the Superseding Indictment, and the additional facts proffered by the Government in the Complaint and elsewhere, the defendants have fallen woefully short of their burden to make a particularized showing for such relief. *See United States* v. *Torres*, 901 F.2d 205, 232 (2d Cir. 1990) ("[a] review of grand jury minutes is rarely permitted without specific factual allegations of government misconduct"), *abrogated on other grounds by United States* v. *Marcus*, 628 F.3d 36 (2d Cir. 2010)); *United States* v. *Forde*, 740 F. Supp. 2d 406, 414 (S.D.N.Y. 2010) ("Mere speculation that the grand jury may have heard insufficient evidence, or that the Government may have improperly instructed the grand jury on materiality, falls far short of the showing to overcome the presumption of secrecy.") (collecting cases).

37

## II.   DEFENDANTS' SUPPRESSION MOTION SHOULD BE DENIED

Defendants challenge the initial order authorizing the interception of wire and electronic communications over Adam Skelos's Cellphone (the "2603 Phone"), signed by Judge Gardephe on December 5, 2014 (the "Interception Order"), and move to suppress all fruit of the Interception Order.  The defendants argue that the facts set forth in the 113-page affidavit of Special Agent Shannon M. Fish of the Federal Bureau of Investigation ("FBI"), dated December 5, 2014 (the "Fish Affidavit" or "Fish Aff."), did not establish probable cause sufficient to justify Judge Gardephe's Interception Order.  They also argue that the 18 pages of that affidavit setting forth how and why normal investigative procedures had been tried and failed, or reasonably appeared to be unlikely to succeed if tried (Fish Aff. pp. 92-110), was inadequate to justify Judge Gardephe' s conclusion that the Government had made the requisite showing of necessity.  These arguments plainly fail and the defendants' suppression motion should therefore be denied.

### A.   There Was a Substantial Basis for Judge Gardephe's Probable Cause Determination

#### 1.   Applicable Law

##### a.  Standard of Review

In ruling on a motion to suppress wiretap evidence, the reviewing court must grant "considerable deference" to the issuing court's findings.  *United States* v. *Concepcion*, 579 F.3d 214, 217 (2d Cir. 2009); *accord United States* v. *Yannotti*, 541 F.3d 112, 124 (2d Cir. 2008); *United States* v. *Gangi*, 33 F. Supp. 2d 303, 306 (S.D.N.Y. 1999) ("[T]he issuing judicial officer's decision to authorize wiretaps 'should be paid great deference by reviewing courts.'") (quoting *Spinelli* v. *United States*, 393 U.S. 410, 419 (1969)).  The subsequent court's review is limited to whether the issuing judicial officer had a "substantial basis" for the finding of probable cause.  *See, e.g.*, *Illinois* v. *Gates*, 462 U.S. 213, 236 (1983); *United States* v. *Wagner*, 989 F.2d

69, 72-74 (2d Cir. 1993).  "[W]iretap orders are entitled to a presumption of validity."  *United States* v. *Ambrosio*, 898 F. Supp. 177, 181 (S.D.N.Y. 1995) (citing *United States* v. *Fury*, 554 F.2d 522 (2d Cir. 1977)).  Accordingly, the defendants bear the burden of proving that probable cause was lacking.  *See United States* v. *Magaddino*, 496 F.2d 455, 459-60 (2d Cir. 1974).  Any doubts as to the existence of probable cause should be resolved in favor of upholding the authorization.  *See United States* v. *Labate*, 00 Cr. 632 (WHP), 2001 WL 533714, at *16 (S.D.N.Y. May 18, 2001); *United States* v. *Gangi*, 33 F. Supp. 2d at 306; *United States* v. *Ambrosio*, 898 F. Supp. at 181.  Although without "the insights of adversarial scrutiny, the issuing judge may not readily perceive every question that might legitimately be raised" regarding the requested wiretap, "so long as fundamental constitutional rights are preserved, the issuing court's determination should not be subjected to gratuitous 'Monday morning quarterbacking.'"  *United States* v. *Gigante*, 979 F. Supp. 959, 963 (S.D.N.Y. 1997).

>    b.    **Probable Cause**

Title 18, United States Code, Section 2518, sets out the procedures governing the interception of oral and electronic communications.  Section 2518(3) requires a probable cause determination on three issues: that an individual is committing, has committed, or is about to commit an enumerated offense; that particular communications concerning that offense will be obtained through the requested interception; and that the facilities subject to interception are being used in connection with the offense.  18 U.S.C. § 2518(3); *see United States* v. *Yannotti*, 541 F.3d at 124; *United States* v. *Diaz*, 176 F.3d 52, 110 (2d Cir. 1999).

Probable cause requires that the totality of the circumstances reflect a fair probability of finding evidence of a crime.  *Illinois* v. *Gates*, 462 U.S. at 238; *see United States* v. *Diaz*, 176 F.3d at 110 (probable cause standard for wiretap is same as probable cause standard for search

39

warrant).  The issuing judicial officer must "make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, . . . there is a fair probability that . . . evidence of a crime will be found in a particular place."  *Gates*, 462 U.S. at 238.  Probable cause "is not an especially demanding standard in this context.  '[O]nly the probability, and not the prima facie showing, of criminal activity is the standard of probable cause.'"  *United States* v. *Bellomo*, 954 F. Supp. 630, 636 (S.D.N.Y. 1997) (quoting *Gates*, 462 U.S. at 235).  Probable cause "to issue a wiretap order exists when the facts made known to the issuing court are sufficient to warrant a prudent [person] in believing that evidence of a crime could be obtained through the use of electronic surveillance."  *United States* v. *Ruggiero*, 824 F. Supp. 379, 398 (S.D.N.Y. 1993), *aff'd*, 44 F.3d 1102 (2d Cir. 1995) (quotation and footnote omitted).

In assessing probable cause, a reviewing court must read a wiretap affidavit as a whole and in a common-sense manner.  Defendants may not "dissect each piece of information in the [agent's] affidavit to show that each fact taken alone does not establish probable cause."  *Gangi*, 33 F. Supp. 2d at 306; *accord United States* v. *Salas*, No. 07 Cr. 557 (JGK), 2008 WL 4840872, *4 (S.D.N.Y. Nov. 5, 2008) (same, quoting *Gangi*).  Put another way, "a court must look at the snowball, not the individual snowflakes."  *United States* v. *Scala*, 388 F. Supp. 2d 396, 402 (S.D.N.Y. 2005).

Probable cause must exist at the time of issuance.  *United States* v. *Marino*, 664 F.2d 860, 866 (2d Cir. 1981).  The "principal factors in assessing whether or not the supporting facts have become stale are [not only] the age of those facts [but also] the nature of the conduct alleged to have violated the law."  *United States* v. *Gallo*, 863 F.2d 185, 191 (2d Cir. 1988).  Where the affidavit presents "a picture of continuing conduct, as opposed to an isolated instance of wrongdoing . . . the passage of time between the last described act and the presentation of the

40

application becomes less significant." *Id.*  In the context of "large scale economic crimes that,

by their very nature, require extended periods of time to bring to fruition, facts even several years

removed may, in context, be far from stale." *Gigante*, 979 F. Supp. at 964.  Courts in the Second

Circuit have repeatedly upheld wiretap orders where the criminal conduct being investigated was

carried out over a substantial time period, even where the passage of time between the last

described act and the presentation of the application was weeks or months.  *See Diaz*, 176 F.3d at

109 ("in a case involving an ongoing narcotics operation . . . 'intervals of weeks or months

between the last described act and the application' for a wiretap do not necessarily make the

information stale") (citations omitted); *United States* v. *Rowell*, 903 F.2d 899, 903 (2d Cir. 1990)

(gap of 18 months did not render information stale); *Martino*, 664 F.2d at 867-69 (three-week

hiatus between last described event and application for wiretap was acceptable where there was

evidence of "ongoing" drug conspiracy); *United States* v. *Feola*, 651 F. Supp. at 1091 (finding

that two and a half months between informant information and the interception order was "a

longer time than is typical of a wiretap operation," but "well within the limits of tolerance for an

alleged ongoing conspiracy," and noting that information in support of a wiretap application "has

an even longer shelf life in a continuing course of criminal conduct" (citing *United States* v.

*Hyde*, 574 F.2d 856, 865 (5th Cir. 1978)).

> ### 2.    Relevant Facts[18]

In the affidavit the Government presented to Judge Gardephe on December 5, 2014,

Special Agent Fish dedicated 80 pages to setting forth evidence establishing probable cause that

Adam Skelos had committed and would continue to commit the predicate crimes using his

---

[18]    Unless otherwise indicated, for the purpose of opposing the suppression motion, we cite only facts set forth within the four corners of the Fish Affidavit.  *See, e.g.*, *United States* v. *Marino*, 664 F.2d 860, 866 (2d Cir. 1981) (probable cause must exist at the time of issuance).

cellphone.  The Fish Affidavit first set forth background facts concerning Dean Skelos and Developer-1, explaining, among other things, Dean Skelos's legislative power and control over Developer-1's business interests.  (Fish Aff. ¶¶ 23, 63-65, 68).  The affidavit then described in detail the scheme by which Dean and Adam Skelos had obtained ongoing payments from Developer-1, about which, as of the date of the Fish Affidavit, the Government had principally learned about through emails and documents obtained by subpoenas and search warrants.

As set forth in emails quoted and summarized in the Fish Affidavit, in July 2012, a senior executive with Developer-1, CW-1 (not then cooperating with the Government), introduced Adam Skelos to the Environmental Technology Company for the purpose of the Company hiring him as a salesman to sell the Company's stormwater services to public officials in New York.  (Fish Aff. ¶ 71).  In doing so, CW-1 touted Adam Skelos's connections to Senate Majority Leader Dean Skelos and promised that Adam Skelos would "exploit his father's contacts statewide."  (*Id.* ¶ 71).  CW-1 began to negotiate Adam Skelos's compensation package over the next few months, often times taking aggressive stances urging the Company to pay Adam Skelos more money, one time complaining that CW-1 "will not put [Developer-1]'s relationship with him in jeopardy over" Adam Skelos's level of compensation.  (*Id.* ¶ 85).  Shortly after Adam Skelos was introduced to the Company, and while his compensation package still was being negotiated, Adam Skelos offered to help the Company extend state legislation in a manner favorable to the Company.  (*Id.* ¶ 79).  Adam Skelos then emailed Senator Dean Skelos about the legislation, who promised to instruct his Chief of Staff to look it up.  (*Id.* ¶ 79).

CW-1, Adam Skelos, and the Company began negotiations for Adam Skelos's contract, an early draft of which Adam Skelos sent to Dean Skelos.  (Fish Aff. ¶ 80).  When Adam Skelos felt that the Company had not finalized his contract in a sufficiently expeditious manner, he

42

informed the Company that he had canceled a meeting with Nassau County officials, communicating that the Company would not gain access to Nassau County officials without first agreeing to pay him. (*Id.* ¶ 86).

Because the negotiations of Adam Skelos's contract with the Company began to slow down, CW-1 and Dean Skelos agreed in the interim that Developer-1 would engineer a payment to Adam Skelos in the form of a title commission. (Fish Aff. ¶¶ 87-92). When Adam Skelos then expressed impatience about the speed of the title payment, Dean Skelos told Adam Skelos, "following up, be patient." (*Id.* ¶ 88). Minutes prior, Dean Skelos had called Developer-1's chief lobbyist. (*Id.*).

After this exchange, in October 2012, Adam Skelos and CW-1 agreed that Adam Skelos would receive a $20,000 check from a title company. (Fish Aff. ¶ 92). Then, in late November 2012, with CW-1's assistance, the Company and Adam Skelos also finalized a compensation agreement to pay Adam Skelos a monthly retainer of $4,000, which would be increased to $10,000 monthly only after the Company started receiving payments on six projects, plus back-end commissions calculated as a percentage of the Company's revenue. (*Id.* ¶ 97).

A few weeks before the agreement was finalized, Superstorm Sandy hit Long Island. (Fish Aff. ¶ 93). After the Company asked Adam Skelos how to make sure that Suffolk and Nassau County would include future public works projects with the Company as part of their FEMA funding requests, Adam Skelos emailed Dean Skelos to ask him what to do. (*Id.* ¶ 93). At approximately the same time, telephone records showed that Dean Skelos, Adam Skelos, and an executive with the Environmental Technology Company, CW-2 (not then cooperating with the Government), participated in a three-way call, after which Adam Skelos emailed the contact information for CW-2 to Dean Skelos. (*Id.* ¶ 94). The very next day, Adam Skelos emailed the

43

Director of District Operations of Senator Dean Skelos, "Any word on Suffolk?," to which the District Operations Director replied, "Your dad prob needs to make a call," after which Adam Skelos was in phone contact with Dean Skelos.  (*Id.* ¶ 95).

Shortly after Adam Skelos signed his compensation agreement, the Environmental Technology Company submitted to Nassau County a proposal for a public works project relating to the treatment of stormwater.  (Fish Aff. ¶ 98).  Within just a few days of the submission, Adam Skelos told the Company that Nassau County officials had decided to go forward with the project it had proposed, which, as telephone records indicate, Adam Skelos first learned from Dean Skelos.  (*Id.* ¶ 98).  Months later, in February 2013, Nassau County followed through and publicly released an RFP.  (*Id.* ¶ 101).  Bids were due on April 4, 2013, and Adam Skelos personally delivered the Company's bid to Nassau County officials.  (*Id.* ¶ 102).

Just a few days after Adam Skelos submitted the bid, but before Nassau County officials had selected the winner of the RFP, CW-1 emailed the CEO of the Company asking to speak about Adam Skelos.  (Fish Aff. ¶ 103).  Earlier that day, Adam Skelos had spoken by phone with CW-1 and Dean Skelos within a short time of each other.  (*Id.* ¶ 103).  Two days later, CW-1 wrote the following email to the CEO of the Company, subject line, "Adam":

> I'm told he's about 45 days away from producing the legislation
> and the RFP to do up to ten million project with you.  He's hesitant
> (and his dad called) to do it with the engineer's [sic] making more
> money than him.  If he doesn't get like a 4% commission I think
> they don't think it's worth pushing through.

(*Id.* ¶ 104).  After CW-2 was forwarded the email by the CEO, CW-2 replied that the Company was being held "hostage."  (*Id.*).

In late May 2013, Nassau County awarded the contract to the Environmental Technology Company for up to $12 million.  (Fish Aff. ¶ 111).  Prior to the award, Adam Skelos had offered

to have Dean Skelos contact the Nassau County Executive on behalf of the Company to speed things along.  (*Id.* ¶ 106).  On May 28, 2013, in response to a request from the Company, Adam Skelos contacted the Nassau County Attorney and requested that the County write a letter stating that the Company had been awarded the Nassau County contract.  Minutes earlier, Dean Skelos also called the Nassau County Attorney.  (*Id.* ¶¶ 108-10).

On July 1, 2013, the Nassau County legislature approved the contract, which, according to the email cited above, Adam Skelos and Dean Skelos had threatened to block unless Adam Skelos's payments were increased. (Fish Aff. ¶ 114).  After the contract's approval by the county legislature, the Company began paying Adam Skelos $10,000 per month, which was substantially in excess of the terms of his compensation agreement.  (*Id.* ¶¶ 114-15).  Adam Skelos continued to receive these monthly $10,000 payments through at least as recently as September 2014, with the CEO of the Company discussing plans to deliver a $10,000 check in person to Adam Skelos in New York City in October 2014.  (*Id.* ¶¶ 115, 127).

The contract was not fully self-funding, and the many months following the execution of the contract involved efforts to secure funding.  (Fish Aff. ¶ 61).  In early June 2014, CW-2 emailed Adam Skelos an article about $125 million from the federal government to fund Nassau County, noting that the Company had been receiving investor questions concerning funding for the Company's Nassau County contract, and CW-2 said that they had to "be more aggressive." (*Id.* ¶ 136).  Adam Skelos sent that email to Dean Skelos, and telephone records reflected that Adam Skelos then spoke to CW-2, Dean Skelos, and a Nassau County official.  (*Id.* ¶ 136).

Just a few weeks before Judge Gardephe signed the Interception Order, on October 29, 2014, Adam Skelos sent Dean Skelos a link to a news article concerning New York State grants for preventing floods and stormwater runoff, asking "Where is this going?"  (Fish Aff. ¶ 146).

Right after the email, Adam Skelos spoke by phone to Dean Skelos and then to CW-2. After Dean Skelos spoke to Adam Skelos, Adam Skelos forwarded CW-2 the email he had sent to Dean Skelos about the funding, stating "Will go over this next time we talk. Don't mention it yet to anyone." (*Id.* ¶ 146).

Special Agent Fish's Affidavit also set forth information concerning Adam Skelos's negotiations with the Company to receive compensation for promoting the use of its technology in connection with fracking, including by meeting with high-level New York State agency officials. (*See* Fish Aff. ¶¶ 148-156). At the time, fracking was not permitted in New York State, but Dean Skelos was a vocal proponent. (*Id.* ¶ 156). During the course of Adam Skelos's efforts to promote fracking before a state agency, in November 2013, he emailed Senator Skelos's Chief of Staff a link to the page on the Company's website about its fracking technology, and confirmed to Dean Skelos by email that he had done so. (*Id.* ¶ 150). In March 2014, Adam Skelos forwarded to Dean Skelos a photograph of the Company's fracking water treatment system, stating, "This is the commercial system I've told you about." (*Id.* ¶ 153). In July 2014, Adam Skelos emailed fracking information jointly to Dean Skelos and CW-2. (*Id.* ¶ 154). As recently as September 16, 2014, Adam Skelos had emailed Dean Skelos saying that they "[n]eed to move on meeting" with the state agency officials. (*Id.*). In November 2014, the election results put Senator Dean Skelos in a position to wield even more power going into the 2015 Senate Session, including with respect to fracking. (Fish Aff. ¶ 156).

With respect to the use of the Target Cellphone in particular, Agent Fish explained that the "chronology of events – which often include an email between co-conspirators known to be related to the scheme followed closely by a call using the Target Cellphone—establishe[d] probable cause that the communications over the Target Cellphone include communications

46

relating to the offenses." (Fish Aff. ¶ 26). Indeed, throughout his affidavit, Special Agent Fish detailed the content and timing of emails relating to the scheme and compared them to phone toll information showing that Adam Skelos had used the 2603 Phone extensively and continuously over the course of two years to engage in communications relating to the scheme. (*See id.* ¶ 180 (noting in particular that "there are numerous instances in which Adam Skelos exchanges an email communication with Dean Skelos or one of the other Target Subjects immediately before or after toll records show calls between the Target Subjects or between a Target Subject and state, county or local Government official")).

Special Agent Fish also presented toll analysis showing that the 2603 Phone had been in contact with CW-2 more than 2,000 times during the prior year, including as recently as 12 days before the Interception Order was signed, the office number for the Environmental Technology Company as recently as 27 days before, and CW-1 as recently as 24 days before. The affidavit also included information that the 2603 Phone was used to speak to Dean Skelos more than 700 times during the prior year, and as recently as 11 days before the Interception Order was signed.

### 3.      Discussion

Read in a whole and commonsense manner, the 113-page Affidavit of Special Agent Fish established through hundreds of emails and phone records, among other things, that there was probable cause to believe—*i.e.* at least a fair probability that—since at least in or about 2012, Adam Skelos and others had been involved in a continuing scheme to obtain money for Adam Skelos from the Environmental Technology Company in exchange for the promise of official acts by Dean Skelos. That evidence included the explicitly extortionate April 10, 2013 email from CW-1 to the Company threatening that Dean Skelos and Adam Skelos would not to "push[ ] through" legislation and the Nassau County contract unless the Company paid Adam Skelos

47

more money, followed later by recurring payments to Adam Skelos continuing through October 2014 in amounts higher than warranted by his compensation agreement.

The affidavit also described numerous instances in which Dean Skelos involved himself in advancing the Company's business interests, including but not limited to: (1) an August 2012 communication from Dean Skelos telling Adam Skelos that he would instruct his Chief of Staff to check on a New York State law for the Company (Fish Aff. ¶ 79); (2) a November 2012 three-way call putting CW-2 in direct contact with Senator Skelos (*id.* ¶ 94); (3) a November 2012 communication between Adam Skelos and Senator Skelos's District Operations Director about Dean Skelos directly contacting Suffolk County officials to convince them to help the Company (*id.* ¶ 95); (4) an April 2013 statement by Adam Skelos telling the Company that he would have Senator Skelos call the Nassau County Executive about the Company's bid in response to the Company's unhappiness with delays (*id.* ¶ 106); (5) Dean Skelos assisting Adam Skelos in persuading a Nassau County official to write a letter confirming the contract was awarded to the Company in May 2013 (*id.* ¶ 110); (6) Adam Skelos involving Senator Skelos's Chief of Staff in the Company's fracking-related business in November 2013, with Dean Skelos's knowledge (*id.* ¶ 150); (7) Adam Skelos telling Dean Skelos that they needed to set up a meeting between the Company and a State agency to discuss fracking in September 2014 (*id.* ¶ 154); (8) Dean Skelos assisting Adam Skelos to pursue contract funding opportunities with Nassau County for the Company in June 2014 (*id.* ¶ 136); and (9) Dean Skelos again helping Adam Skelos to pursue funding opportunities for the Company's contract during October 28-31, 2014 (*id.* ¶ 146).

The initial application also described numerous calls involving the 2603 Phone since 2012 that had coincided with various emails and other information demonstrating its use in connection with the scheme all throughout the period, including communications with co-

48

conspirators during the 11 to 12 days leading up to the Interception Order.  This information established probable cause to believe evidence of the crime could be obtained through the interception of the 2603 Phone.  There is no viable argument that Judge Gardephe's probable cause determinations lacked a substantial basis.

Nonetheless, the defendants argue that the facts supporting Judge Gardephe's findings of probable cause were outdated and that the Government failed to establish "'fresh' reasons for believing that a wiretap will lead to evidence of the past acts."  (Def. Mot. to Suppress 5-7 (quoting *United States* v. *Martino*, 664 F.2d at 866)).  Defendants' staleness argument misses the mark for several reasons.  First, the object of conducting wiretap surveillance was not limited simply to collecting evidence of "past acts."  (Defs. Mot. to Suppress 7).  Indeed, the evidence before Judge Gardephe established at the very least a fair probability—all that is required—that the scheme was ongoing and was of such a nature that it would take time for the scheme fully to play out.  Indeed, Adam Skelos continued to receive extortion payments through at least October 2014 (Fish Aff. ¶ 115), and Dean Skelos was involved in the Environmental Technology Company's continued efforts to procure state and federal funding for its contract with Nassau County (which would have increased Adam Skelos's commissions) up until at least the last days of October 2014 (*id.* ¶ 146).  The defendants argue that the recent emails through October 2014 related to the Environmental Technology Company, "demonstrated nothing more than the performance of [Adam Skelos's] widely known and well-documented duties for the Company."  (Defs. Mot. to Suppress 8).  This argument ignores the totality of the circumstances as of the time of the initial Interception Order, including the facts showing, among other things, that Adam Skelos was continuously being paid extortion payments by the Company in exchange for

49

official acts by Dean Skelos, Adam Skelos was in ongoing and recent contact with the extortion victims and co-conspirators, and that Dean Skelos was presently assisting the Company.

Second, the defendants wrongly disclaim the evidentiary value of the toll analysis demonstrating that the 2603 Phone was in very recent contact with other members of the conspiracy and the extortion victims. The 2603 Phone was calling CW-2 as recently as 12 days before the Interception Order. The defendants describe CW-2 simply as "Adam Skelos's co-worker and someone he took direction from while at the Environmental Technology Company." (Defs. Mot. to Suppress 8). However, as was made clear to Judge Gardephe from the affidavit as a whole, CW-2 was much more than Adam Skelos's "co-worker." CW-2 was the person at the Company to whom Adam Skelos directly and repeatedly offered Senator Dean Skelos's assistance. (*See, e.g.*, Fish Aff. ¶¶ 79, 94, 106). CW-2 was also one of the recipients of the defendants' threat to use the official power of Dean Skelos to punish the company if it did not increase its payments to Adam Skelos. When he received the threat, CW-2 aptly described the email threat as a "hostage" situation. (*Id.* ¶ 101). Thus, there was probable cause that the ongoing communications between Adam Skelos and CW-2 would reveal evidence of the schemes to bribe Dean Skelos through payments to Adam Skelos and the ongoing extortion payments from the Company to Adam Skelos. In light of these facts—including phone contacts between co-conspirators within days of the Interception Order—the defendants' argument that the Fish Affidavit was "stale" falls flat. *See United States* v. *Rowell*, 903 F.2d at 903 (holding that gap of 18 months did not render information stale); *United States* v. *Fama*, 758 F.2d 834, 838 (2d Cir. 1985) (5 weeks); *Martino*, 664 F.2d at 867 (3 weeks).

Similarly, the calls between Dean Skelos and Adam Skelos, occurring as recently as 11 days before the Interception Order, cannot be written off as nothing more than unremarkable

conversations between a father and son in light of the facts set forth in the affidavit as a whole. *See, e.g.*, *United States* v. *Todisco*, 667 F.2d 255, 258 (2d Cir. 1981), *cert. denied*, 455 U.S. 906 (1982) (pen register and other contacts "subject to an innocent interpretation when viewed in isolation" supported probable cause finding when set in context). Indeed, Special Agent Fish specifically set forth dozens of instances when it was apparent that Dean Skelos and Adam Skelos were communicating about the solicitation of payments from Developer-1 and the Environmental Technology Company. Among other times, Dean Skelos and Adam Skelos spoke on the day the "hostage" message was evidently communicated to CW-1 (Fish Aff. ¶¶ 103-104), on a three-way call with CW-2 after Dean Skelos and Adam Skelos emailed about obtaining Sandy-related contracts for the Company (*id*. ¶¶ 93), on the day that Adam Skelos contacted the Nassau County Attorney about obtaining the Nassau County contract approval for the company (also the same day Dean Skelos called the same official) (*id.* ¶ 110), and on numerous other days when the Company asked Adam Skelos to contact Nassau County officials about the approval and funding for the Company's contract. (*Id.* ¶¶ 106, 113, 119, 136). When given its proper weight in the overall context of the affidavit, Adam Skelos's calls with Dean Skelos, as well as the others cited in the affidavit, provided sufficiently recent information upon which Judge Gardephe was entitled to find probable cause. The Government's affidavit established the existence of a continuing scheme and that Adam Skelos was presently using his cellphone to communicate about the scheme with others. *See, e.g.*, *Diaz*, 176 F.3d at 109; *Martino*, 664 F.2d at 867-69; *United States* v. *Feola*, 651 F. Supp. at 1091 (where affidavit alleged a two-year conspiracy, "[i]t was permissible for the justice to infer that if criminal conversations had been

51

occurring over this telephone line over the past two years, they had not mysteriously stopped within the past month" (quotation omitted)).[19]

Applying the appropriate deferential standard of review and reading the affidavit in the proper manner, Judge Gardephe's probable cause determinations cannot be said to have lacked a substantial basis.

## B.   Judge Gardephe's Necessity Findings Were Also Amply Supported

### 1.   Applicable Law

Title 18, United States Code, Section 2518(1)(c) requires that an application for the interception of telephonic communications include "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous."  Similarly, Section 2518(3)(c) requires the judge reviewing a wiretap application to determine, as a condition of authorizing the wiretap, that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous."

---

[19]    The affidavit also set forth that Adam Skelos had been in contact with CW-1 approximately one month prior to the application.  CW-1 had arranged for Adam Skelos's job with the Company, touted Adam Skelos's ability to "exploit" Dean Skelos's influence, and transmitted the defendants' threat to the Company to that if it did not increase Adam Skelos's payments the defendants would interfere with the Company's bid with Nassau County.  Defendants do not even attempt to proffer an innocent explanation of the contact between CW-1 and Adam Skelos, which in and of itself established probable cause that interception of Adam Skelos's cellphone would reveal evidence of the target offenses.  Rather, defendants make the conclusory claim that the contact between Adam Skelos and CW-1 would not by itself establish the necessary probable cause.  Not only the defendants fail to cite any authority for this proposition, defendants may not "dissect each piece of information in the [agent's] affidavit to show that each fact taken alone does not establish probable cause." *Gangi*, 33 F. Supp. 2d at 306.

These requirements ensure that "wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime." *United States* v. *Kahn*, 415 U.S. 143, 153 n.12 (1974). As the Second Circuit has explained:

> [T]he purpose of the statutory requirements of § 2518 is not to preclude the Government's resort to wiretapping until after all other possible means of investigation have been exhausted by investigative agents; rather, the statute only requires that the agents inform the authorizing judicial officer of the nature and progress of the investigation and of the difficulties inherent in the use of normal law enforcement methods.

*Diaz*, 176 F.3d at 111 (internal citation and quotations omitted); *accord United States* v. *Concepcion*, 579 F.3d 214, 218 (2d Cir. 2009) (Government not "required to exhaust all conceivable investigative techniques before resorting to electronic surveillance"). Thus, Title III's "alternative investigative techniques" sections do not establish a "requirement 'that any particular investigative procedures be exhausted before a wiretap be authorized.'" *United States* v. *Young*, 822 F.2d 1234, 1237 (2d Cir. 1987) (quoting *United States* v. *Lilla*, 699 F.2d 99, 104 (2d Cir. 1983)); *accord United States* v. *Miller*, 116 F.3d 641, 663 (2d Cir. 1997). "The issue of whether a normal investigative method has been exhausted must be tested in a practical and common sense manner." *Diaz*, 176 F.3d at 111; *accord United States* v. *Ruggiero*, 726 F.2d 913, 924 (2d Cir. 1984); *United States* v. *Trippe*, 171 F. Supp. 2d 230, 236 (S.D.N.Y. 2001) ("[T]he application must be viewed in a practical and common sense manner and need be only minimally adequate to support the issuing judge's determination of necessity.").

Just as with respect to the probable cause determination, substantial deference is owed by the reviewing court to the issuing court's prior finding of necessity. *See United States* v. *Gigante*, 979 F. Supp. 959, 963 (S.D.N.Y. 1997) ("In subsequently reviewing these determinations [probable cause and necessity], the trial court must accord substantial deference to the findings of the issuing judicial officer, limiting its review to whether the issuing judicial

53

officer had a 'substantial basis' for making the requisite findings.") (citing *United States* v. *Wagner*, 989 F.2d 69, 71 (2d Cir. 1993)); *see also Concepcion*, 539 F.3d at 217 (agreeing that Second Circuit precedent looks to whether the court that issued the wiretap order abused its discretion, and whether the affidavit was "minimally adequate" to support that judge's decision to issue the order). In a number of instances, the Second Circuit has reversed orders by district courts suppressing wiretap evidence because the suppression orders failed to show the appropriate level of deference to the authorizing judge's finding of necessity. *See Concepcion*, 579 F.3d at 219 (reversing reviewing judge's suppression order because, with appropriate deference paid to issuing judge's initial assessment that alternative investigative techniques failed or were unlikely to be fruitful, the affidavit was "minimally adequate" to support a finding of necessity); *id.* at 217 (citing *Wagner*, 989 F.2d at 74 ("revers[ing] the district court's suppression of evidence because it had not accorded sufficient deference to the initial decision to authorize a wiretap, on which the Government had relied")).

Because wiretap orders are presumptively valid the defendants bear the burden of proving that necessity was lacking. *See United States* v. *Magaddino*, 496 F.2d 455, 459-60 (2d Cir. 1974).

### 2.    Relevant Facts

Special Agent Fish dedicated 18 pages of his affidavit to setting forth case-specific information why various normal investigative techniques had not and/or were not reasonably likely to "reveal, among other things, the full nature, extent and methods of the scheme, including how Adam Skelos wields potential official actions by Dean Skelos in communications with county and municipal officials and in communications with Abtech personnel, and how

Adam Skelos, Dean Skelos, and others coordinate the use of Dean Skelos's influence to obtain more payouts to Adam Skelos."  (Fish Aff. ¶ 26).

Special Agent Fish first explained why the use of undercover officers did not appear to be possible.  He noted that an undercover officer would "not be able to establish the necessary relationship of trust within a reasonable time frame, if at all," because this was a "close-knit" conspiracy.  (Fish Aff. ¶ 162).  In particular, fully penetrating the conspiracy likely would be impossible because Dean Skelos and Adam Skelos were father and son and the other participants, including those at Developer-1 and the Environmental Technology Company, were linked by close business relationships.  (*Id.* ¶ 162).  Moreover, Special Agent Fish stated that in his experience, individuals close to powerful elected officials are "often highly reticent about discussing their criminal activities with unknown persons," and the suspicion "only would be heightened by Dean Skelos's prior experiences as a potential target of the Moreland Commission investigation with respect to his outside income from [the law firm] and by his likely awareness of a grand jury subpoena served" on the law firm seeking information about his outside income. (*Id.* ¶ 162).  Citing these same specific reasons, Special Agent Fish explained that attempts to introduce a confidential informant into the situation also likely would fail or lead to the discovery of the investigation.  (*Id.* ¶ 166).

Special Agent Fish explained that physical surveillance of the participants was an insufficient investigative tool because, in the particular context of an "investigation into political corruption . . . there are myriad legitimate reasons for an individual or group of individuals to meet with a legislator like Dean Skelos."  (Fish Aff. ¶ 168).  In addition, Special Agent Fish noted that surveillance would be unreasonably difficult in this case because any meetings were expected to take place inside office buildings; Special Agent Fish specifically described how the

Government had attempted to conduct surveillance of the CEO of the Environmental Technology Company in New York City in October 2014 but were thwarted when he went into a private club into which agents could not enter without arousing suspicion. (*Id.* ¶ 170). Special Agent Fish also noted that surveillance of Adam Skelos's and Dean Skelos's homes were not likely to be an effective investigative tool because "seeing people enter their homes adds no further information tha[n] the information already ascertainable from toll records and email search warrants; it only reveals the identities of individuals who are in contact with [them]," and, in any event, they both lived in "secluded residential areas where unfamiliar cars parked on the street with tinted windows or occupants are likely to draw the attention of residents and local law enforcement, who regularly patrol the areas." (*Id.*). Similarly, using GPS tracking would not have achieved the goals of the investigation because the mere presence of the targets of the investigation at particular locations or even in each other's presence, would not, by itself, demonstrate the nature of the scheme. (*Id.* ¶ 174). Special Agent Fish likewise explained that searching through the trash from the defendants' homes would not be reasonably likely to succeed because the defendants were unlikely to discard documents with more investigative value than their emails, which had not been sufficient to reveal the full scope and nature of the scheme, and agents would not covertly be able to pull the trash from Dean Skelos's or Adam Skelos's offices because it was kept on the private property of the buildings and surrounded by locked fences. (*Id.* ¶ 188).

Special Agent Fish reported that telephone records and pen registers were being used in connection with the investigation, but that information was of only limited use. In particular, "where the case involves contacts with the offices of public officials, such as the Nassau County Executive's office and other offices" the telephone records did not reflect the identities of the specific individuals within those offices who were using those phones. Moreover, the entire

56

application was based on phone records showing the proximity of phone contacts to email communications, which was enough to establish probable cause, but would fall short, without more, of the type and quality of evidence needed to file criminal charges and prevail at trial.

Special Agent Fish stated that the Government had "extensively employed grand jury subpoenas" in connection with the investigation. However, he noted that the continued use of grand jury subpoenas would be of limited utility because "the issuance of grand jury subpoenas to individuals who interacted with Adam or Dean Skelos in relation to the [Environmental Technology Company] scheme, or who facilitated the scheme in some way, would be likely to prompt recipients of the subpoenas to contact Adam or Dean Skelos and other target subjects, and to make them aware of the existence of the investigation," which would likely cause them to "prevent the Government from obtaining critical evidence." (Fish Aff. ¶ 177).

Special Agent Fish also described the limitations of some of the information the Government received by grand jury subpoena, including bank records for the defendants and the Environmental Technology Company, which showed payments "but did not indicate the reasons for the payments." (Fish Aff. ¶ 178). The Government also had obtained some documents from Developer-1 during a separate investigation during a search performed using the term "Skelos," some of which were described in the affidavit. (*Id.* ¶ 178). Special Agent Fish explained that the Government could not ask Developer-1 to run more search terms focused on the Company without likely alerting individuals affiliated with Developer-1, including CW-1, who, as established earlier in the affidavit, had participated in the scheme under investigation and was in communication with Adam Skelos and Dean Skelos. (*Id.*). As a result, in Special Agent Fish's estimation, there was a "high likelihood" that further inquiry of Developer-1 related to the Environmental Technology Company would have resulted in Dean Skelos being contacted,

creating a danger of destruction of evidence and frustration of the investigation. (*Id.* ¶ 178). For the same reasons, it would have potentially damaged the investigation to serve subpoenas on governmental agencies relating to the Company. (*Id.* ¶¶ 178, 190).

Much of the 80-page probable cause showing in Special Agent Fish's affidavit was based on statements in emails obtained by search warrants that "were useful in confirming the fact that a bribery scheme was taking place involving Adam Skelos" and the Environmental Technology Company. (Fish Aff. at page 101 (unnumbered paragraph)). Where the search warrant evidence, alone, fell short in particular, however, was revealing the full extent of Dean Skelos's involvement in the scheme. (*Id.* at page 102). While emails to and from Dean Skelos were useful to the investigation, in particular because they showed that Dean Skelos "often emailed Adam Skelos various news articles relevant to [the Environmental Technology Company] business and included language directing Adam's attention to particular aspects of the article or recommending he talk to various people," Dean Skelos's emails with Adam Skelos were "typically very short, and, while not coded, were also not typically easily understandable without having the context provided by whatever oral communications they contemporaneously engaged in over" the 2603 Cellphone. (*Id.* ¶ 180). Special Agent Fish also revealed to Judge Gardephe that the Government had not yet obtained a search warrant for Dean Skelos's email account because header information obtained by court order had shown that the timeframe of available emails was limited, and emails the Government had already reviewed demonstrated that Dean Skelos was "more likely to engage in substantive communications on the telephone than through emails." (*Id.* at page 102 n.17). In particular, Special Agent Fish noted that there were "numerous instances in which Adam Skelos exchanges an email communication with Dean

58

Skelos or one of the other target subjects immediately before or after toll records show calls between the target subject and state, county, or local Government official." (*Id.* ¶ 180).

Special Agent Fish explained that, based on his training and experience, approaching witnesses at that stage of the investigation would not achieve the full objectives of the investigation and was "reasonably likely to prematurely cause the target subjects to cease engaging in illegal conduct and prevent the Government from obtaining critical information concerning the operation of the scheme." (Fish Aff. ¶ 183). Specifically, Special Agent Fish cited the fact that the scheme was "relatively self-contained, in that Adam Skelos and Dean Skelos appear to work closely together to keep each other informed about [the Environmental Technology Company]'s needs and Dean Skelos's actions in furtherance of those needs," and therefore it was unlikely that "any outsider would have sufficient insight to be able to provide meaningful assistance to the Government's investigation, even if they were willing to cooperate with the investigation." (*Id.* ¶ 184).

Special Agent Fish also explained that the Government had considered approaching CW-2 and the CEO of the Company, but "we believe that these approaches run too high a risk that [CW-2] or [the CEO] will alert Adam Skelos and/or Dean Skelos to the nature of our investigation, either directly or indirectly." (Fish Aff. ¶ 185). His belief was based in part on the fact that CW-2 and the CEO "appear to have a substantial interest in [the Company]'s business objectives succeeding, and therefore have a sharply reduced interest in the Government uncovering the full extent of the means and methods by which they purchased the influence of Dean Skelos on stormwater projects and funding, as well as, apparently, fracking." (*Id.* ¶ 185).

Special Agent Fish also disclosed that CW-1 and a lobbyist for Developer-1 had met with the United States Attorney's Office previously (prior to the discovery of the bribery scheme

59

involving the Environmental Technology Company) concerning "limited areas relating to a separate investigation," and neither of them had volunteered information relating to the Environmental Technology Company, or on their relevant dealings with Dean or Adam Skelos. (Fish Aff. ¶ 186). Accordingly, Special Agent Fish concluded that seeking to re-interview them about the scheme likely would "lead to this information being shared with other target subjects, eliminating the ability of any further covert investigative techniques." (Fish Aff. ¶ 186).

Lastly, Special Agent Fish explained that the Moreland Commission's investigation into public corruption, which was closed in March 2014, did not discover the payments by the Environmental Technology Company to Adam Skelos. Accordingly, the files it provided to the Government were not helpful in relation to the investigation. (Fish Aff. ¶ 189).

### 3.    Discussion

Judge Gardephe was presented with a full and complete report of what the Government had done in its investigation as of the date of the Fish Affidavit, and a detailed explanation of why a number of normal techniques were not sufficient to collect evidence that would fully reveal the entire scope and nature of the scheme and result in a successful prosecution against Adam Skelos and other scheme participants. Special Agent Fish's affidavit was detailed and presented case-specific reasons why wiretap interceptions were needed and justified.

The defendants argue that (1) email search warrants and grand jury subpoenas were adequate investigative tools; and (2) the Government could have developed and utilized cooperators without having to resort to a wiretap. (Defs. Mot. to Suppress 10-15). Neither argument demonstrates that Judge Gardephe abused his discretion in finding that the Government had made the requisite showing.

Defendants' argument that email search warrants and grand jury subpoenas were adequate to meet the objectives of the Government's investigation (Defs. Mot. to Suppress 10-

11), ignores the essential purpose of the wiretap—revealing the full scope of the criminal conspiracy by intercepting the conversations in furtherance of the conspiracy taking place over the phone.  (Fish Aff. ¶ 26) (wiretap needed to reveal, among other things, "how Adam Skelos, Dean Skelos, and others coordinate the use of Dean Skelos's influence to obtain more payouts to Adam Skelos"); *see United States* v. *Bellomo*, 954 F. Supp. 630, 639 (S.D.N.Y. 1997) ("The wiretap . . . was sought and authorized in order to allow law enforcement officers to intercept conversations regarding certain criminal activity that it believed would take place over [the] cellular phone. . . . The alternative methods [proposed by the defendant] would not have aided the government's attempt to hear telephone conversations discussing illegal conduct.").  The Government established that the co-conspirators were communicating not only over email, but also separately and in substantial part over the phone, which made the wiretap technique necessary to develop evidence sufficient to satisfy the objectives of the Government's investigation.

Defendants' reliance on *United States* v. *Lilla*, which overturned a county judge's necessity finding because normal investigative procedures were successful, is misplaced because that case was a "small-time narcotics case" in which the State Trooper's necessity showing was nothing more than two paragraphs of wholly conclusory statements.  699 F.2d at 101, 104.  In fact, the defendants' own arguments—that Adam Skelos is prone to "misrepresenting and/or exaggerating his father's efforts" (Defs. Mot. to Suppress 3 n.3) and that "the emails demonstrated that neither Dean nor Adam Skelos had committed any crimes" (*Id.* at 11)—show exactly why it was reasonable for Judge Gardephe to conclude that this investigation needed to intercept phone communications in order to achieve its objectives.  *See United States* v. *Labate*, 2001 WL 533714, at *15 ("Certainly the Government's efforts were directed not only to uncover

61

and monitor the alleged criminal activity, but to be able to prosecute the offenders with convincing and competent evidence."). As Special Agent Fish set forth repeatedly throughout his affidavit, Dean Skelos and Adam Skelos were in frequent telephone contact around the same time as emails apparently related to criminal activity. It is precisely those conversations the wiretap sought to capture, among others. Moreover, Special Agent Fish explained that Dean Skelos's emails, alone, were insufficient to fully reveal the extent of his participation because they were "typically very short, and, while not coded, were also not typically easily understandable without having the context provided by whatever oral communications they contemporaneously engaged in over" the phone. (Fish Aff. ¶ 180).[20] For the same reason and because the header information for Dean Skelos's email account indicated that emails from only a limited time period were available (*Id.* ¶ 71 n.6), the Court should reject defendants' argument that Judge Gardephe abused his discretion by not requiring the Government to search Dean Skelos's emails prior to authorizing a wiretap. *See Concepcion*, 579 F.3d at 218 (Government not "required to exhaust all conceivable investigative techniques before resorting to electronic surveillance").

Defendants' arguments that the Government should have approached potential cooperators or re-interviewed certain witnesses impermissibly rely on hindsight. Specifically, they argue that because CW-2 in fact began to cooperate when approached, the Government should have been ordered to make that approach before obtaining a wiretap. (Defs. Mot. to Suppress 12-13). This argument is unavailing. The applicable standard on review is whether, with deference to his judgment, Judge Gardephe had a sufficient basis to conclude that it was reasonable not to approach CW-2 at that time. Accordingly, the fact that CW-2 actually

---

[20]   The shorthand nature of Dean Skelos's emails contradicts defendants' argument that the emails "are no different than calls." (Def. Mot. to Suppress 11).

cooperated when approached two months later is irrelevant to Judge Gardephe's necessity finding just as the incriminating conversations that were actually intercepted over Adam Skelos's cellphone are irrelevant to Judge Gardephe's probable cause finding. Moreover, the fact that CW-2 cooperated after a productive wiretap had provided clear evidence of his culpability says nothing about whether he would have cooperated if the Government approached him before obtaining this evidence.

The defendants also find fault with Special Agent Fish's explanation of why the participants in the scheme were unlikely to cooperate, calling it "boilerplate." To the contrary, in portions of the affidavit ignored by the defendants, he specifically explained why it was reasonable not to approach the other scheme participants. For example, Agent Fish noted that this particular scheme was "relatively self-contained, in that Adam Skelos and Dean Skelos appear to work closely together to keep each other informed about [the Company]'s needs and Dean Skelos's actions in furtherance of those needs" and therefore it was unlikely that "any outsider would have sufficient insight to be able to provide meaningful assistance to the Government's investigation, even if they were willing to cooperate with the investigation." (Fish Aff. ¶ 184). Special Agent Fish also explained that CW-2 and the CEO "appear to have a substantial interest in [the Company]'s business objectives succeeding, and therefore have a sharply reduced interest in the Government uncovering the full extent of the means and methods by which they purchased the influence of Dean Skelos on stormwater projects and funding, as well as, apparently, fracking." (*Id.* ¶ 185). The defendants' conclusory assertion that witness approaches were more likely to be successful "where the witnesses would also be the 'victims' of the alleged criminal activity," (Defs. Mot. to Suppress 14), fails to appreciate that, in the

63

context of federal public corruption laws, extortion victims may also be co-conspirators in a bribery scheme.

Finally, Special Agent Fish noted that the Developer-1 representatives who had met with the Government in a separate investigation, and who apparently were involved in conversations relating to this bribery scheme, failed to bring their activities with respect to Dean Skelos and Adam Skelos to the Government's attention. (Fish Aff. ¶ 186). Certainly, in this context, it was not unreasonable for the Government to decline to approach representatives of Developer-1, who appeared to be involved in ongoing criminal activity.[21]

In sum, the necessity showing by Special Agent Fish went far and beyond what was required, and the defendants have failed to meet their burden of demonstrating that Judge Gardephe abused his discretion in his necessity findings.

## C.     The Good Faith Exception Applies

Although the Court need not reach the issue, even if Judge Gardephe abused his discretion in issuing the Interception Order—which he did not—the Government relied on the Interception Order in good faith and suppression would not be an appropriate remedy. *See United States* v. *Leon*, 468 U.S. 897, 922 (1984). Wiretap evidence obtained in violation of Section 2518 is subject to suppression under 18 U.S.C. § 2515, which provides for exclusion of such evidence if disclosure "would be in violation of this chapter." *See also* 18 U.S.C. § 2518(10) (specifying grounds for suppression). While the statute thus contains its own exclusionary provisions, several courts have held that the exceptions to the Fourth Amendment's

---

[21]     Defendants also fault the Government for not requesting all of CW-1's emails from Developer-1. However, as the affidavit points out, Developer-1 produced emails responsive to the search term "Skelos," which appears in Adam Skelos's email address and could be expected to capture virtually all relevant communications. The defendants, who bear the burden, do not explain what emails Developer-1 could have turned over that would have revealed the participants' criminal communications over the phone, a primary purpose of the wiretap.

exclusionary rule are equally applicable to these statutory provisions, and that, in particular, the holding of *Leon* that evidence will not be suppressed if it was obtained in good faith reliance on a search warrant applies equally to motions to suppress evidence obtained under wiretap orders. *See, e.g.*, *United States* v. *Moore*, 41 F.3d 370, 376-77 (8th Cir. 1994); *United States* v. *Malekzadeh*, 855 F.2d 1492, 1497 (11th Cir. 1988); *United States* v. *Brewer*, 204 Fed. App'x 205, 208 (4th Cir. 2006) (unpublished *per curiam*); *United States* v. *Tomero*, 462 F. Supp. 2d 565, 572 (S.D.N.Y. 2006); *United States* v. *Gotti*, 42 F. Supp. 2d 252, 267 (S.D.N.Y. 1999); *United States* v. *Bellomo*, 954 F. Supp. 630, 638 (S.D.N.Y. 1997); *United States* v. *Ambrosio*, 898 F. Supp. 177, 187 (S.D.N.Y. 1995). *But see United States* v. *Rice*, 478 F.3d 704 (6th Cir. 2007) (good-faith exception to exclusionary rule is not applicable to an improperly obtained warrant for a wiretap).

The Second Circuit has not yet ruled on this precise issue. In *United States* v. *Bianco*, 998 F.2d 1112, 1125-26 (2d Cir. 1993), however, the Court squarely rejected the contention that the statutory exclusionary provisions applicable to wiretap evidence preclude application of identified exceptions to the Fourth Amendment exclusionary rule. Instead, the *Bianco* Court held that the holding of *Franks* v. *Delaware*, 438 U.S. 154 (1978)—that evidence seized pursuant to a search warrant would not be suppressed on the basis of false statements or omissions in the application, unless they were intentional and material—was equally applicable to wiretaps, suggesting that the exceptions that apply in the Fourth Amendment context apply to suppression of evidence obtained pursuant to Title III as well. *United States* v. *Bianco*, 998 F.2d at 1126; *see also United States* v. *Rajaratnam*, 719 F.3d 139, 152 (2d Cir. 2013) (concluding that a "District Court did not err by applying the analytical framework of *Franks* to determine whether the government's wiretap application required suppression"). The principle articulated

65

in *Leon* is analogous to the holding of *Franks*, and serves the same salutatory purpose of declining to suppress evidence where suppression would serve no deterrent purpose.  Indeed, the *Bianco* Court specifically cited *Leon* as one of the exceptions to the exclusionary rule that it had in mind in concluding that Fourth Amendment principles apply to the statutory exclusion provisions relating to wiretap evidence. *Bianco*, 998 F.2d at 1126.

Under *Leon*, a wiretap order that is later found to have been issued without probable cause will be suppressed only if "(1) the issuing judge abandoned his detached, neutral role; (2) the agent was dishonest or reckless in preparing the supporting affidavit for the wiretap order; or (3) the agents' reliance on the warrant was not reasonable."  *Bellomo*, 954 F. Supp. at 638.  Here, the defendants do not assert that any of these conditions are met, nor could they credibly do so.  Accordingly, because the investigating agents relied in good faith on the Interception Order, even if this Court were to find infirmities with Judge Gardephe's findings (which it should not), there would be no reason to suppress any of the evidence collected.

## III.    THE DEFENDANTS FAIL TO MAKE A *PRIMA FACIE* SHOWING OF A RULE 6(E) VIOLATION AND THEIR MOTION FOR A RULE 6(E) HEARING FAILS

In their motion for a Rule 6(e) hearing, defendants argue that three news reports and a letter provided by a news reporter to Adam Skelos during the pendency of the Government's investigation establish a *prima facie* case that the Government "leaked grand jury information to the press in violation of Federal Rule of Criminal Procedure 6(e)."  (Defs. 6(e) Mot. 1.)  In particular, the defendants point to the following:

(1) a January 29, 2015 report televised on WNBC claiming the existence of a federal investigation into Dean Skelos (the "WNBC Report");

(2) an April 2, 2015 letter from a reporter for the New York Times to Adam Skelos posing a series of questions related to, among other things, Adam Skelos's consulting job for the Environmental Technology Company and a $20,000 payment that Adam Skelos received

from a title insurance company that he did not work for ("Title Company-1") (the "April 2 Letter");

(3) an April 15, 2015 article in the New York Times reporting on an alleged federal investigation into Dean Skelos and Adam Skelos for, among other things, Adam Skelos's employment with the Company and the $20,000 payment to Adam Skelos from Title Company-1 (the "April 15 NYT Article"); and

(4) a May 1, 2015 article in the Wall Street Journal referencing the charges against the defendants in a "draft complaint" (the "May 1 WSJ Article"), three days prior to the arrest of the defendants.

Defendants' motion fails because the news reports they rely upon are insufficient to state the required *prima facie* case for a Rule 6(e) hearing to determine whether grand jury secrecy rules were violated. None of the cited articles contains the details necessary to establish a disclosure of the grand jury's inner workings—*i.e.*, the articles do not name witnesses or summarize any testimony given in the grand jury; they do not contain descriptions of questions asked by the grand jurors, or dates on which the grand jury would return an indictment. Simply put, the news reports relied on by the defendants do not disclose "matters occurring before the grand jury," as required by Rule 6(e), nor do they support an inference that such disclosures occurred.

Moreover, the news articles cited by the defendants cannot be read fairly to suggest that the source of their information was a Government attorney. The cookie-cutter references in the articles to "people familiar with the investigation" are insufficient to establish a *prima facie* violation of Rule 6(e), particularly in light of the wide-ranging nature of the Government's investigation into the defendants, which included ██████████████████████████ ████████████████████████████████████████████████████████ ), over 80 witness interviews, and communications with dozens of attorneys regarding the investigation. These numerous parties were all aware of the existence of the investigation, and any one of them could have provided information about it to the press, or provided it to others

who in turn provided it to the press.  Finally, the prosecution team charged with presenting the case to the grand jury expressly denies violating grand jury secrecy rules in the affidavit attached hereto as Exhibit A ("Martins Aff.").  Accordingly, the defendants' motion for a Rule 6(e) hearing must be denied.

## A.      Relevant Facts

As previously described, the Government's investigation into Dean Skelos began in or around April 2014 with, among other things, an examination of Dean Skelos's employment as "Of Counsel" with a Long Island law firm (the "Law Firm"), which was affiliated with a lobbying firm ("Lobbying Firm").  Dean Skelos was not paid by the Law Firm for performing legal work, but rather was compensated for referring clients to the Law Firm and/or meeting with such clients (including clients with business before the State). (Compl. n.3.).  The Lobbying Firm lobbied state legislators on behalf of its clients and operated essentially as a practice group within the Law Firm.  Among other things, the Lobbying Firm shared office space with the Law Firm, the Lobbying Firm's revenues were shared with the Law Firm, the Law Firm partners worked with the Lobbying Firm to jointly develop business and serve overlapping clients, and the Law Firm determined compensation for the Lobbying Firm employees.  The Moreland Commission to Investigate Public Corruption had previously sought to probe the outside income of legislators including the Assembly Speaker Sheldon Silver and Dean Skelos, but those efforts came to an end when the Governor of New York negotiated an agreement with the Legislative leaders to terminate the Moreland Commission's operations in connection with the adoption of a 2014-15 State budget that included certain ethics reforms.

As part of its investigation, the Government received and reviewed document productions



Within the first few months of the investigation, the Government broadened its inquiry to include Adam Skelos. In particular, the Government determined that Developer-1 had arranged for Adam Skelos to receive a lucrative contract as a "government relations consultant" by the Environmental Technology Company, which had won a large public project in Nassau County that depended on state legislative action to become fully funded. The Government also uncovered that Developer-1 had arranged for Adam Skelos to receive a $20,000 check for supposedly providing title insurance services for Title Company-1, a title insurance company that did not employ him and that was affiliated with Developer-1.

Thus, by January 29, 2015 (the date of the WNBC Report), the Government had ████ ███████████████████████████████████████████████████████████████████████████ ███████████████████████████████, including:

- ███████████████████████████████████████████████████████████████████████████
- ███████████████████████████████████████████████████████████████████████████ ██████████████████████████
- ███████████████████████████████████████████████████████████████████████

69



-
-
- ;
-
- ; and
-

Also by January 29, the Government had interviewed a witness who discussed Dean Skelos's relationship with a real estate developer on Long Island that was a client of the Law Firm, as well as title insurance work referred to Adam Skelos by the Law Firm at Dean Skelos's request.

From January 29, 2015 to April 15, 2015 (the date of the April 15 NYT Article), the Government continued to investigate the relationship between Dean Skelos and the Law Firm and Lobbying Firm; Dean Skelos's interactions with Developer-1; and Adam Skelos's employment with companies that had business before New York State.  During that period, the Government interviewed approximately 25 individuals about both Dean Skelos and Adam Skelos, including, but not limited to, the $20,000 payment to Adam Skelos by Title Company-1; Dean Skelos's and Adam Skelos's dealings with Developer-1 and other real estate developers in New York regarding work for Adam Skelos; and Dean Skelos and Adam Skelos's role and participation in the award and execution of the Nassau County Contract to the Environmental Technology Company.  (Martins Aff. ¶ 6.)  In February 2015, the Government also conveyed to

70

corporate counsel for Developer-1 that the Government believed CW-1 needed separate criminal defense counsel based on the $20,000 payment CW-1 had arranged for Adam Skelos.  (*Id.* ¶ 7.) Also in February 2015, the Government had discussions with multiple defense attorneys who initially sought to—but ultimately did not—represent CW-2.  (*Id.* ¶ 7.)  The Government told these lawyers that the Government was seeking CW-2's cooperation in connection with an investigation of Dean Skelos and Adam Skelos.  (*Id.*)

From January 29, 2015 to April 15, 2015, the Government ████████████████





Parallel to its presentation of evidence to the grand jury, the Government was engaged in drafting a criminal complaint against the defendants based principally not on evidence then presented to the grand jury, but on the fruits of its wide-ranging investigation into the defendants and their business dealings, which evidence included materials obtained through search warrants, wiretap orders, and witness interviews outside of the grand jury.

On May 1, 2015, the Government submitted to U.S. Magistrate Judge Michael H. Dolinger the 43-page Complaint against the defendants containing detailed factual allegations based on information obtained from dozens of witnesses, intercepted telephone calls by Dean Skelos, Adam Skelos and others, seized email correspondence, and numerous subpoenaed documents and other evidence.

The defendants were arrested on May 4, 2015 and were permitted to self-surrender.  The grand jury continued hearing evidence after the arrests.  Thereafter, on May 28, 2015, the grand jury hearing evidence in this case returned an Indictment that tracked the charges in the Complaint.  On July 21, 2015, the same grand jury returned the Superseding Indictment adding two counts related to Adam Skelos's no-show job at the Malpractice Insurance Administrator.

**B.      Applicable Law**

The rule of grand jury secrecy prohibits the disclosure of "a matter occurring before the grand jury" by, among others, "[a] grand juror, an interpreter, a court reporter, an operator of a recording device, a person who transcribes recorded testimony, [or] an attorney for the government," absent certain exceptions.  Fed. R. Crim. P. 6(e). [22]  A knowing violation of this restriction "may be punished as a contempt of court."  *Id.*  Before a court will order a hearing on a possible breach of Rule 6(e) related to news media reports about a grand jury inquiry, "the defendant must establish a *prima facie* case" that the disclosed matters had occurred before the grand jury and that the source of the disclosure was a prohibited party.  *United States* v. *Rioux*,

---

[22]      The Supreme Court has explained the policy considerations underlying grand jury secrecy as follows:

> [W]e have noted several distinct interests served by safeguarding the confidentiality of grand jury proceedings.  First, if preindictment proceedings were made public, many prospective witnesses would be hesitant to come forward voluntarily, knowing that those against whom they testify would be aware of that testimony.  Moreover, witnesses who appeared before the grand jury would be less likely to testify fully and frankly, as they would be open to retribution as well as to inducements.  There also would be the risk that those about to be indicted would flee, or would try to influence individual grand jurors to vote against indictment.  Finally, by preserving the secrecy of the proceedings, we assure that persons who are accused but exonerated by the grand jury will not be held up to public ridicule.

*Douglas Oil Co.* v. *Petrol Stops Northwest*, 441 U.S. 211, 218-19 (1979) (footnotes omitted).

73

97 F.3d 648, 662 (2d Cir. 1996) (citing *Barry* v. *United States,* 865 F.2d 1317, 1321 (D.C. Cir. 1989)).  If the defendant makes such a showing, then the burden shifts to the Government to "attempt to explain its actions" in a show cause hearing.  *In re Sealed Case No. 98-3077*, 151 F.3d 1059, 1068 (D.C. Cir. 1998) (quotation omitted).

In order to determine if the defendant established a *prima facie* violation of Rule 6(e), the court makes a three-part inquiry: "(1) whether the media reports disclose matters occurring before the grand jury; (2) whether the media report discloses the source as one prohibited under Rule 6(e); and (3) evidence presented by the government to rebut allegations of a violation of Rule 6(e)."  *United States* v. *Rioux*, 97 F.3d at 662 (citation omitted).[23]

Although Rule 6(e) does not define when a matter is one "occurring before the grand jury," courts have explained that the phrase covers a disclosure that "would tend to reveal some secret aspect of the grand jury's investigation."  *Senate of the Com. of Puerto Rico ex rel of Judiciary Comm.* v. *U.S. Dep't of Justice (SoCPR)*, 823 F.2d 574, 582 (D.C. Cir. 1987) (Ginsburg, R.B., J.) (internal punctuation omitted); *see also United States* v. *Dynavac Inc.*, 6 F.3d 1407, 1413 (9th Cir. 1993) (disclosure prohibited only if it reveals some "secret aspect of the inner workings of the grand jury.").  Examples often cited of grand jury secrecy violations "are disclosures that reveal the identity of grand jurors or expected witnesses, reveal witness' expected testimony or questions they would be asked, reveal transcripts or the substance of testimony, reveal the strategy or direction of a grand jury investigation, or report when the grand

---

[23]     Although the defendants do not seek dismissal of the Superseding Indictment in their motion, it is worth noting that dismissal of an indictment for a Rule 6(e) violation—if it is shown—is only appropriate in extraordinary circumstances where "it is established that there was a violation which substantially influenced the grand jury's decision to indict, or if there is grave doubt that the decision to indict was free from the substantial influence of such violations." *Rioux*, 97 F.3d at 662 (internal punctuation omitted) (citing *Bank of Nova Scotia* v. *United States*, 487 U.S. 250, 256 (1988)).

jury will return an indictment." *United States* v. *Rosen*, 471 F. Supp. 2d 651, 655 (E.D. Va. 2007) (citing cases).[24] *See also In re Sealed Case No. 99-3091*, 192 F.3d 995, 1001-02 (D.C. Cir. 1999) (stating that Rule 6(e) does not require that a "veil of secrecy be drawn over all matters occurring in the world that happen to be investigated by a grand jury") (citation omitted).

Disclosure of information gathered through grand jury subpoenas does not violate Rule 6(e) absent "some affirmative demonstration of a nexus between disclosure and revelation of a protected aspect of the grand jury's investigation." *Senate of the Com. of Puerto Rico ex rel of Judiciary Comm.* v. *U.S. Dep't of Justice (SoCPR)*, 823 F.2d at 584. *See United States* v. *Thomas*, 736 F.3d 54, 65-66 (1st Cir. 2013), *cert. denied*, 134 S. Ct. 1771 (2014) (Rule 6(e) not implicated by the sharing of certain information obtained through a grand jury subpoena where the evidence was never presented to a grand jury); *United States* v. *Phillips*, 843 F.2d 438, 441 (11th Cir. 1988) (Rule 6(e) not violated because subpoenaed documents "were never seen by the grand jury" and did not otherwise "indicate[] the pattern of the grand jury investigation or the deliberations of the grand jury"); 24 *Moore's Federal Practice*, § 606.06 (Matthew Bender 3d ed. 2013) ("[S]ome types of materials possessed by the grand jury might be disclosable without tending to compromise the grand jury's need for secrecy. Principal among these are documents, particularly business records, subpoenaed by the grand jury.").[25]

---

[24]   The "strategy and direction" of a grand jury proceeding can refer to the expected date the grand jury is expected to return an indictment. *United States* v. *Rosen*, 471 F. Supp. 2d at 655.

[25]   Notwithstanding the above, because the law is not fully settled regarding "matters occurring before a grand jury" and because law enforcement has an interest in maintaining the confidentiality of ongoing investigations, the Government takes a conservative approach in this and other grand jury investigations by, for example, limiting disclosure of documents produced to the grand jury.

Similarly, "information produced by criminal investigations paralleling grand jury investigations does not constitute matters 'occurring before the grand jury' if the parallel investigation was truly independent of the grand jury proceedings." *In re Grand Jury Subpoena*, 920 F.2d 235, 242 (4th Cir. 1990); *see also In re Grand Jury Investigation (Lance)*, 610 F.2d 202, 217 (5th Cir. 1980) ("the disclosure of information obtained from a source independent of the grand jury proceedings, such as a prior government investigation, does not violate Rule 6(e)").  Accordingly, courts have held that the disclosure of information gathered through search warrants or other independent investigative action did not violate Rule 6(e).  *In re Grand Jury Subpoena*, 920 F.2d at 242–43.  And the mere reference to a "federal investigation" is not sufficiently tied to a grand jury proceeding for purposes of the Rule 6(e) inquiry.  *United States* v. *Rioux*, 97 F.3d at 662 (distinguishing news stories discussing federal "investigations" from articles "actually discussing matters before the grand jury.").

If a defendant shows that news articles contained actual matters occurring before a grand jury, then the court looks to whether the cited articles reveal the source of the information to be one proscribed by Rule 6(e).  For example, Rule 6(e) "does not prevent disclosures by a witness who testifies before the grand jury."  *In re Grand Jury Investigation* (Lance), 610 F.2d at 217; *accord In re Grand Jury Proceedings*, 417 F.3d 18, 26 (1st Cir. 2005).  It also "does not protect from disclosure information obtained from a source other than the grand jury, even if the same information is later presented to the grand jury."  *United States* v. *Eastern Air Lines, Inc.*, 923 F.2d 241, 244 (2d Cir. 1991) (quoting *Blalock* v. *United States,* 844 F.2d 1546, 1551 (11th Cir. 1988) (*per curiam*)).

Finally, in assessing whether a defendant has made a *prima facie* case sufficient to warrant a Rule 6(e) hearing, the court must weigh any evidence presented by the Government to

76

rebut allegations of a Rule 6(e) violation. *Rioux*, 97 F.3d at 662. The Government's evidence typically is presented in the form of an affidavit from the prosecuting attorneys. *Id.* (holding that District Court properly considered the government attorney's affidavit in finding that the defendant did not make a *prima facie* showing) (citing cases); *see also In re Grand Jury Investigation (Lance)*, 610 F.2d at 219 ("[t]he inability to show a definite source for some of the information contained in the articles might cause a prima facie case to fail if a responsive affidavit denying the allegations is made") (citing cases).

## C.      Discussion

### 1.      Defendants Fail To State A *Prima Facie* Case Of A Rule 6(e) Violation

The defendants fail to make a *prima facie* showing that certain details reported in the news media regarding the instant case concerned "any matter occurring before the grand jury," or that attorneys from the Government made unauthorized disclosures of any such matter. As a threshold matter, ████████████████████████████████████████████████████████ ███████████████ (Martins Aff. ¶ 8.) Until that time, there simply was no matter reported in the news that would reveal some "secret aspect of the inner workings of the grand jury." *United States* v. *Dynavac,* 6 F.3d at 1413. Moreover, although the Government had ██████████████ ████████████████████████████████████████, the Government's investigation also involved the analysis of substantial materials obtained through search warrants, wiretaps, and witness interviews that took place outside the grand jury. *See, e.g., United States* v. *Eastern Air Lines, Inc.*, 923 F.3d at 244; *In re Grand Jury Subpoena*, 920 F.2d at 242. Thus, there can be no *prima facie* showing that either the January 29 WNBC Report or the April 2 Letter was based on an unauthorized disclosure of a matter occurring before the grand jury: ████████████████ ██████████████████████████.

77

With respect to the April 15 NYT Article and the May 1 WSJ Article, the articles on their face do not disclose "matters occurring before the grand jury," and defendants fail to show that the information about the investigation in those articles came from the Government rather than other sources including any of the witnesses who testified in the grand jury or any of the individuals or entities that were subpoenaed in connection with the instant investigation.  Thus, the defendants also fail to make any *prima facie* showing of an unauthorized disclosure of grand jury material with respect to these articles.

Moreover, with respect to all of the cited news articles, the Government attorneys in charge of this prosecution and who attended the grand jury presentations, as well as case investigating agents and investigators, have confirmed in the attached affidavit that they did not disclose any information presented in the grand jury (or any information related to the investigation at all) to any member of the press.  (Martins Aff. ¶¶ 13-16.)  In light of the representations contained in the Affidavit submitted by the prosecution team, and in the articles themselves, which do not contain matters occurring before the grand jury and specifically note that the U.S. Attorney's Office and the Federal Bureau of Investigations declined to comment on the investigations, defendants cannot make a *prima facie* showing that the information contained in their cited news articles could only have been learned in violation of Rule 6(e).  Accordingly, their motion for a hearing should be denied.

### i.     The January 29, 2015 WNBC News Report

On January 29, 2015—several days after the arrest of Speaker Silver and approximately nine months after the commencement of the Government's investigation into Dean Skelos—WNBC aired a report by Jonathan Dienst claiming that the USAO was investigating "how Skelos made some of his money with part of the investigation looking into his apparent ties to the real

estate industry." (Def. Ex. F.) Dienst attributed his report to "sources familiar with the investigation." (*Id.*) In the WNBC Report, Dienst noted that Dean Skelos worked for the Law Firm, but did not provide any details concerning any specific aspect of that relationship under investigation. The WNBC Report also did not make any further reference to Dean Skelos's "ties to the real estate industry." Dienst noted that "a spokesman for U.S. Attorney Preet Bharara . . . declined to comment, as did FBI spokesmen in New York and Washington." At the conclusion of the short broadcast, WNBC Anchor Chuck Scarborough asked Dienst whether he was privy to when a decision would be made "about whether or not to charge Skelos," to which Dienst responded that "*Investigators are being very tight lipped. Our understanding is a decision could come in a matter of weeks, up to the next month or two.*" (*Id.*) (emphasis added).

As previously noted, ███████████████████████████████████████ ██████████████. (Martins Aff. ¶ 8.) Putting aside the fact that the report merely claimed, without any additional detail, that the purported focus of the investigation was on Dean Skelos's employment by the Law Firm and his "ties to the real estate industry," ███████████████ ████████████████████████████████████████████████████████. That fact, in itself, disqualifies the WNBC Report from consideration by the Court of whether Rule 6(e) was violated. *SoCPR*, 823 F.2d at 584 (requiring "nexus between disclosure and revelation of a protected aspect of the grand jury's investigation").

Moreover, nothing in the WNBC Report suggests that, even if the reported information were to constitute a matter occurring before a grand jury, Dienst's sources included the Government.[26] Dienst sourced his report to "people familiar with the investigation," which by

---

[26] At the time of the WNBC Report, the Government had wiretaps on both Dean Skelos and Adam Skelos's telephones. Defendants do not explain why the Government would attract publicity to its investigation through unauthorized disclosures when such publicity typically

January 29, 2015, included dozens of subpoenaed parties. (Martins Aff. ¶ 5.) Moreover, Dienst specifically stated in his report that the U.S. Attorney's Office and the FBI declined to comment on his report, and that "[i]nvestigators are being very tight lipped." (Def. Ex. F.) Taken as a whole, there is no reasonable basis for the defendants to argue that the contents of the WNBC Report emanated from a source prohibited by Rule 6(e), even if the defendants' allegation did not fail for the simple fact that no grand jury was hearing evidence as of the date of the report.

### ii.     The April 2, 2015 Letter To Adam Skelos

The April 2 Letter asked Adam Skelos a series of questions, including questions related to the $20,000 payment he received from Title Company-1; Adam Skelos's involvement in the Nassau County contract; and possible conflicts of interest for Dean Skelos regarding legislation pertaining to "the real estate industry, infrastructure, environmental and construction issues like design-build, and his support at the time for fracking." (Def. Ex. B.) Dean Skelos received a similar letter from the New York Times the same day. (Def. Ex. C.) The April 2 Letter did not cite any source for most of the information contained in its questions; rather, several questions simply began with the phrase "[O]ur reporting indicates that . . . " (Def. Ex. B, e.g., Qs. 3-5.) With respect to a question related to Adam Skelos's employment with a title insurance company, the April 2 Letter stated that it had obtained the information from that company's website. (*Id.* at Q.9.)

Again, defendants' assertion that the "reporter's questions make it likely that he had received confidential grand jury information from the government prior to putting together the letters," (Defs. 6(e) Mot. 11), is easily defeated by the fact that ███████████████

---

would have a chilling effect on telephone communications. In fact, after the WNBC Report aired, the defendants increased their use of coded language on the telephone and apparently began using modes of communication that they believed could not be readily intercepted such as FaceTime and in-person meetings. (*See e.g.,* Compl. ¶¶ 51(a)-(g)).

80

████████████████████████████████████████████████████████

████    (Martins Aff. ¶ 8.)  Moreover, the defendants' claim that the author of the April 2 Letter is "plainly aware of an ongoing federal investigation focused on Adam Skelos and Senator Skelos" (Defs. 6(e) Mot. 11 (internal punctuation omitted)) is not germane to the Rule 6(e) inquiry, as the mere existence of an investigation is not a "matter occurring before the grand jury" for purposes of Rule 6(e).  *See United States* v. *Rioux*, 97 F.3d at 662.

As with the WNBC Report, even if the defendants could show that the April 2 Letter contained information regarding "a matter occurring before the grand jury," their attempt to state a *prima facie* case of a Rule 6(e) violation fails for the additional reason that the information could have been obtained from a number of sources other than the Government.  ████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████    (Martins Aff. ¶ 6.)  ████

████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████    Defendants have made no showing that the information in the April 2 Letter was "likely" to come from the Government, rather than the dozens of individuals who were aware of the Government's investigation at that time.

### iii.      The April 15, 2015 New York Times Article

On April 15, 2015, the New York Times published a story stating that "[f]ederal prosecutors have begun presenting evidence to a grand jury considering the case against" the defendants "according to people with knowledge of the matter." (Def. Ex. J.)   The article noted that prosecutors had conducted interviews and had served "a number of subpoenas in recent weeks . . . including several to state senators on Long Island." (*Id.*)  The article further stated that the Government's inquiry focused on Adam Skelos's relationship with the Environmental Technology Company, including whether Dean Skelos "exerted any influence" in matters involving the company, and whether Adam Skelos's hiring was part of a scheme in which Dean Skelos "would take official action that would benefit" the Environmental Technology Company or Developer-1.  The article also said the Government's inquiry was focusing on "a $20,000 payment from a title insurance company that he never worked for." (*Id.*)

In addition to referencing "people familiar with the questions being asked by federal authorities" who "spoke about the investigation . . . on the condition of anonymity because of the delicate nature of the subject," the article cited a number of public sources, including the regulatory filings of the Environmental Technology Company's parent company, a 2006 article in Newsday, and other public records signed by CW-2 and other executives of Developer-1, that showed the ties between Developer-1 and the Environmental Technology Company.  (Def. Ex. J.)  The reporters also quoted a spokeswoman for the Nassau Department of Public Works, who stated that Adam Skelos had introduced Nassau County public officials to the Company and who further confirmed that "Mr. Skelos had roughly a dozen meetings and phone calls with a senior public works official; that person was a member of the committee that evaluated the proposals for the storm-water project" that was the subject of the Nassau County Contract.  (*Id.*)

82

The defendants argue that the April 15 NYT Article "contained extensive details regarding the grand jury investigation . . . [o]n its face." (Defs. 6(e) Mot. 12.)  On the contrary, nothing in the April 15 article suggests any disclosure of "matters occurring before the grand jury."  The fact that the Government had begun presenting evidence to a grand jury does not, in and of itself, reveal anything of substance about the grand jury proceedings—for example, the article does not reference any witness names, summarize any testimony or evidence presented, or point to any charges being considered by the grand jury.  The naked fact that prosecutors had "begun presenting evidence to a grand jury" could have come from any witness who testified or was scheduled to testify before the grand jury or anyone whom the witness told.  Moreover, the two areas of inquiry identified in the article are the same areas that were the subject of the April 2 Letter, which was drafted before the grand jury had considered any evidence in the instant case.  (Martins Aff. ¶ 8).  Knowing that the investigation into Dean Skelos and Adam Skelos was being conducted out of the USAO's Public Corruption Unit (a fact easily discerned from the face of the Government's subpoenas) made it reasonable to suggest that this Office was examining official corruption by Dean Skelos and does not, by itself, render it "likely" that reporters obtained information from the Government.

In addition, the April 15 NYT Article does not "on its face" implicate Government sources.  By the time the article was published, the Government had interviewed approximately 25 witnesses, ███████████████████████████████.  (Martins Aff. ¶ 6).  It had also ████████████████████████████████████████████████████████████████ ████████████████████.  (*Id.*).  Any one of the dozens of individuals with knowledge of the Government's investigation—including the individuals who were interviewed by the Government ██████████████████████████, any of their employees or their lawyers, or

83

anyone they shared this information with—could have disclosed details of the Government's document requests and areas of investigative interest. Nothing in the article suggests "on its face" that the information—most of which is non-specific and much of which is sourced to public records—was disclosed by a prohibited source.

### iv.    The May 1, 2015 Wall Street Journal Article

On May 1, 2015, the Wall Street Journal published an article stating that federal prosecutors were "expected to announce criminal charges" against the defendants "as soon as Monday [May 4]." (Def. Ex. L). The May 1 WSJ Article referred to the existence of a "draft complaint" that included allegations of conspiracy, extortion and solicitation of bribes related to a "real-estate developer and an environmental technology company." (*Id.*).[27] The report also noted that the Government's investigation "include[d] information presented to a grand jury," and named "people familiar with the matter" as the source of the information. (*Id.*). The article quoted a number of individuals on the record regarding the impact such charges would have on Albany, in particular in light of the prosecution of Silver.

Defendants argue that the disclosure of the existence of a "draft complaint" against the defendants with possible charges could only have been from the Government. Defendants point to "the nature of the crimes which would be charged, and the number of persons who would be

---

[27]    In their motion, defendants capitalize the words "Real Estate Developer" and "Environmental Technology Company" when quoting the May 1 WSJ Article, making it appear that the article employed the same defined terms as the final Complaint. (Defs. 6(e) Mot. at 14.) Defendants then argue that the article "uses the precise terminology employed in the complaint, which refers to the 'Real Estate Developer' and the 'Environmental Technology Company.'" (*Id.*) The Complaint does not refer to the "Real Estate Developer"—rather, it names "Developer-1" as involved in arranging work for Adam Skelos in exchange for favorable treatment from Dean Skelos. With respect to the article's reference to the "environmental technology company," the company describes itself as an "environmental technologies and engineering firm" on its publicly-available website. *See* http://www.abtechindustries.com/#!the-company/c1h4p (last visited Sep. 22, 2015).

charged" as violating Rule 6(e).  (Defs. 6(e) Mot. 14).  More generally, they argue that the article's reference to information being presented before the grand jury also violated Rule 6(e).

As an initial matter, defendants are incorrect that purported disclosures about a sealed Complaint would violate the grand jury secrecy rules.  The Government does not condone, of course, any unauthorized disclosures concerning its draft documents, or complaints filed under seal.  As a general matter, alerting defendants of imminent charges via the media risks the destruction of evidence, the movement of forfeitable funds or flight from the jurisdiction before arrests can be executed, and can in some cases risk law enforcement safety.  However, Rule 6(e) protects only *grand jury* proceedings from disclosure, not charging instruments drafted by prosecutors and approved by a judge.  Fed. Crim. R. 6(e).  Defendants point to no information in the May 1 WSJ Article that necessarily related to any evidence being heard by the grand jury—in fact, the only substantive description of the contents of the actual Complaint related to the defendants' involvement with the Nassau County contract, a long-reported fact that had been the

██████████████████████████████████████████████████████

(Martins Aff. ¶¶ 6, 12.)  The only specific reference in the article to the grand jury related to the unsurprising fact that the Government had presented information to it—in other words, something that could have come from anyone called to appear before it and nothing that "would tend to reveal some secret aspect of the grand jury's investigation."  *SoCPR*, 823 F.2d at 582; *see also In re Sealed Case No. 99-3091*, 192 F.3d at 1001-02 (Rule 6(e) does not require that a "veil of secrecy be drawn over all matters occurring in the world that happen to be investigated by a grand jury.") (citation omitted)).

\*     \*     \*

In sum, the defendants have not presented a *prima facie* case that a matter occurring before the grand jury was disclosed by the Government in violation of Rule 6(e).  The articles the defendants cite do not refer to the grand jury's inner workings and do not attribute the cited information to Government sources.  Moreover, the Government affirmatively denies that the prosecution team made any statements to the press about the ongoing investigations, as reflected in the attached affidavit.  Accordingly, the defendants' motion should be denied.  *See Rioux*, 97 F.3d at 662 (affirming decision to rely on government affidavits to find no *prima facie* Rule 6(e) violation) (citing *In re Archuleta*, 432 F.Supp. 583, 599 (S.D.N.Y. 1977) and *United States* v. *Sweig*, 316 F. Supp. 1148, 1154-55 (S.D.N.Y. 1970), *aff'd*, 441 F.2d 114 (2d Cir.)).

### 2.       Defendants Will Not Suffer Any Unfair Prejudice

Separate and apart from the defendants' failure to state a *prima facie* case of any Rule 6(e) violation, the defendants cannot show that they have or will suffer any prejudice from the purported disclosures.  *See United States* v. *Eisen*, 974 F.2d 246, 261 (2d Cir. 1992) ("a defendant seeking reversal or a hearing regarding alleged grand jury abuse must show prejudice or bias"); *United States* v. *Friedman,* 854 F.2d 535, 583-84 (2d Cir. 1988) (in the absence of showing of prejudice, district court's refusal, without holding a hearing, to grant post-trial relief for alleged grand jury leaks not error).

The defendants do not and cannot allege a cognizable harm at trial based on pretrial publicity.  *See, e.g.*, *United States* v. *Washington*, 705 F.2d 489, 499 (D.C. Cir. 1983) ("Since the concern over adverse publicity is its effect on the fairness of the ensuing trial . . . it was not error to fail to hold an evidentiary hearing concerning the effect of pre-indictment publicity on the

grand jury.").[28]  Moreover, as set forth below, the defendants would not be unfairly prejudiced by the Government's use of the news articles—in particular the January 29, 2015 WNBC Report and other contemporaneous reports—as an explanation for why Dean Skelos "took no legislative action in 2015 to benefit" the Environmental Technology Company.  (Defs. 6(e) Mot. 1).

As an initial matter, defendants' prejudice argument must be understood to relate only to the Government's use of the WNBC Report on January 29, 2015, as the other reports relied upon by the defendants post-dated the final budget passed on April 1, 2015, which is the operative date by which Dean Skelos was expected to take legislative action in favor of the Company.  (*See* Def. Ex. B (April 2), J (April 15), and L (May 1).)  The fact that the WNBC Report made the defendants more cautious in the steps they were willing to take to achieve the conspiracy's goals is not mere speculation by the Government.  The defendants themselves referred to the press related to the WNBC Report during intercepted communications (*see, e.g.*, AS #2148, 2157-58, 2175; DS# 682, 692, 697), and Adam Skelos had conversations about the need to take steps to conceal his activities because Dean Skelos was the focus of that press, a fact that the Government also expects will be corroborated by testimony at trial (AS #2216, 2433).  Moreover, as detailed in the Complaint and Superseding Indictment, the Government expects to argue at trial that Dean Skelos's ability to take legislative action on behalf of the Environmental Technology Company in the 2015-2016 budget was compromised by several factors independent

---

[28]     The defendants' request that the grand jury be polled on whether it was affected by the pretrial publicity should also be rejected out of hand.  *See, e.g.*, *United States* v. *Burke*, 700 F.2d 70, 82 (2d Cir. 1983) (affirming the denial of a hearing on pre-indictment publicity where defendants "failed to cite any persuasive evidence of actual grand jury prejudice," but merely "contend[ed] in very general terms that [adverse news coverage and publicity had] prejudiced them").  The defendants incorrectly claim that the Government's potential use of news reports at trial distinguishes this case.  The fact that the Government might use the news reports at *trial* is irrelevant to whether the *grand jury* was allegedly affected by the pretrial publicity.  Moreover, despite defendants' speculative suggestion to the contrary, (Defs. 6(e) Mot. 6 n.7), the grand jury that indicted the defendants was not the same grand jury that indicted Sheldon Silver.

of the WNBC Report.  In particular, the arrest of ex-Speaker Sheldon Silver on January 22, 2015 and the subsequent focus by the Governor and the Legislature on passing ethics reform impaired Dean Skelos's ability to enact the legislation being sought by the Environmental Technology Company.  (Compl. ¶¶ 14(d), 55; Superseding Indictment ¶ 30.)  These allegations are also supported by intercepted communications during the course of the conspiracy, which the Government expects will be supported by witness testimony.  (*See, e.g.*, AS #3968, 3976, 4147).  Thus, putting aside the fact that the defense has made no showing that the WNBC Report— which predated the Government's presentation to the grand jury by more than two months— contained unauthorized Rule 6(e) disclosures, the Government's use of the WNBC Report (or other press reports) will not unfairly prejudice the defendants given that the steps they took to limit their activities is corroborated by independent evidence and was also due to factors other than the media reports of the purported investigation of Dean Skelos.

## IV.    THE DEFENDANTS' MOTION FOR A BILL OF PARTICULARS FAILS

### A.    Relevant Facts

As noted, the May 4, 2015 Complaint spanned 43 pages and provided extraordinary detail about the evidence gathered during the Government's investigation of the defendants. Among other things, the Complaint directly quoted from emails, (*see, e.g.*, Compl. ¶¶ 19(b), 26(b), 27(b)), 27(c)), 29(b), 31(b)), wiretaps (*id.* ¶¶ 51(a)-(g), 53(b), 54(b), 55(a), 55(c)-(e), 56), and consensually recorded conversations (*id.* ¶¶ 53(a), 54(a)), summarized statements of cooperating and other witnesses (*id.* ¶¶ 24(a)-(e), 26(a)-(c), 29(a), 29(c), 30(c)-(d), 34), identified dates of particular meetings and other key events (*id.* ¶¶ 24(a)-(d), 29(a)-(g), 36(d)-(h)), and set forth particular payments received by Adam Skelos and official actions taken by Dean Skelos (*id.* ¶¶ 12, 32-33, 39-43).  Similarly, the Superseding Indictment mirrored many of the

Complaint's allegations and added information concerning the Malpractice Insurance Administrator, including a detailed description of the events surrounding defendants' solicitation of extortion and bribe payments and the official actions taken by Dean Skelos as part of the scheme (Superseding Indictment ¶¶ 17-28).

On May 7, 2014, just three days after the defendants' arrest, the Government produced to the defendants the nine wiretap affidavits (the "T-III Affidavits") sworn out by agents during the course of the investigation. Each T-III Affidavit is more than 100 pages providing the defendants with even more information about the Government's evidence and allegations, including additional citations to emails and wiretap calls with agents' interpretations of those communications, summaries of additional oral witness statements, the actual names of some of the Government's witnesses, the identities of other targets and subjects of the investigation, dates of key phone contacts between the defendants and their co-conspirators/victims, and particular investigatory steps taken by the Government.

Following the return of the Indictment, the Government provided Rule 16 discovery in electronic form to the defense by June 22, 2015 and thereafter on a rolling basis as new material came into the Government's possession and/or was requested by the defense. The discovery included the evidence that the Government intends to introduce at trial, including the wiretap recordings of the defendants, consensual recordings of the defendants and others, emails obtained pursuant to search warrants, and other documents and records obtained through subpoenas. The Rule 16 discovery also included additional wiretap materials, including the Government's periodic reports to the Court with quotations and interpretations of pertinent calls, as well as the underlying email search warrant affidavits, which provided further details of the

89

Government's evidence by highlighting key emails and phone calls. In order to assist the

defense's review of the discovery, the Government took the following steps:

- The Government categorized the discovery by the type of evidence and by source of the entity that produced the material. For example, documents produced by the New York State Senate were produced in an electronic folder called "NYS Senate." New York State Legislation that the Government planned to introduce was produced in folders called "Legislation."[29] The Government has periodically created and provided text-searchable indices of the entire discovery production to further aid the defense.

- For intercepted wiretap calls, the Government produced text-searchable linesheets as a guide to the wiretap calls, identifying the participants in the call, whether the call was deemed pertinent, and summaries of the contents of the call.

- For emails seized pursuant to search warrants, the Government provided emails in ".pst" format, which can be easily reviewed, sorted, and searched in the standard Microsoft Outlook email program. In addition, the Government provided the defense with the Government's own work product in categorizing the emails by subject areas. For example, emails related to Developer-1 were identified by the Government to the defense by placing the emails in folders under Developer-1's name. The same was done for the Environmental Technology Company and the Malpractice Insurance Administrator as well as numerous other subject areas.

- With respect to documents produced by third parties, the Government generally provided the documents to the defense in the same format that it was produced to the Government since many parties produced documents in electronically searchable formats. To the extent any parties produced paper documents to the Government, the Government converted the documents and produced them to defense electronically so that they could be organized and searched.

In addition to electronic discovery, on June 22, 2015, the Government provided the defense with

summaries of certain witness statements, which the Government produced in order to assist the

defendants' preparation for trial. Upon the defendants' request, the Government subsequently

provided the defense with the contact information for each of these witness's attorneys.

---

[29] In certain instances, where appropriate, the Government even created and labeled sub-folders to further aid the defense's review. For example, Adam Skelos's phone records were produced in a folder labeled "Adam Skelos," within the folder "Phone Records."

90

Also in response to the defendants' request, the Government subsequently provided the defense with a list of co-conspirators and a list of 75 interstate wires, comprised of emails and phone calls, that it intends to introduce at trial on September 16, 2015. The Government provided the latter information even though the Superseding Indictment does not allege a substantive wire fraud offense. The Government also agreed to provide the defense with Jencks Act and *Giglio* material by October 16, 2015, one month before trial.

In addition to Rule 16 and pretrial discovery, the Government also has had numerous informal discussions with the defense concerning the Government's allegations and evidence.

## B.     Applicable Law

Rule 7(f) of the Federal Rules of Criminal Procedure permits a defendant to seek a bill of particulars where needed to "prepare for trial, to prevent surprise, and to interpose a plea of double jeopardy should he be prosecuted a second time for the same offense." *United States* v. *Bortnovsky*, 820 F.2d 572, 574 (2d Cir. 1987). However, a bill of particulars is not to be used as a general investigative tool. "It is not enough that the information would be useful to the defendant; if the defendant has been given adequate notice of the charges against him, the government is not required to disclose additional details about its case." *United States* v. *Payden*, 613 F. Supp. 800, 816 (S.D.N.Y. 1985). "Acquisition of evidentiary details is not the function of the bill of particulars." *United States* v. *Torres*, 901 F.2d 205, 234 (2d Cir. 1990).

Instead, a bill of particulars is required "only where the charges of the indictment are so general that they do not advise the defendant of the specific acts of which he is accused." *Id.* Because "a bill of particulars confines the government's evidence at trial to the particulars furnished," they are generally disfavored. *Payden*, 613 F. Supp. at 816. In general, the Government cannot be compelled to provide a bill of particulars disclosing such things as the

91

manner in which it will attempt to prove the charges, the precise manner in which the defendant committed the crimes charged, or a preview of the Government's evidence or legal theories that it intends to advance at trial. *United States* v. *Mitlof*, 165 F. Supp. 2d 558, 569 (S.D.N.Y. 2001) (collecting cases); *see also United States* v. *Guerrerio*, 670 F. Supp. 1215, 1225 (S.D.N.Y. 1987) (explaining that a bill of particulars "is not a discovery tool and is not intended to allow defendants a preview of the evidence or the theory of the government's case").

## C.    Discussion

In light of these well-established legal principles, the Government has provided more than sufficient information about the charges against which the defendants must defend. The defendants have long been in possession of the 43-page criminal Complaint and 31-page Superseding Indictment filed against the defendants, which set forth in great detail factual allegations by the Government. The defense is also in possession of hundreds of pages of wiretap and search warrant affidavits that outline evidence revealed during the Government's investigation and identify numerous pertinent documents, wiretap calls, emails, and, in some cases, statements by witnesses. For wiretap recordings the Government also provided linesheets containing draft summaries of the conversations and categorizations of the Government's belief whether intercepted calls were pertinent or not, as well as the Government's periodic reports that highlight particular pertinent calls. For emails, the Government organized them into searchable folders indicating whether the Government currently believes the emails are pertinent and, in most cases, has further subcategorized the emails into particular subject matter areas within the pertinent category.

With respect to all documents and files produced in discovery, the Government also provided detailed indices, including a specific index for emails, and cover letters categorizing the

materials.  With respect to witness statements, the Government provided the defense with summaries of certain statements by 17 different witnesses in order to assist in their trial preparation.  Finally, the Government recently provided the defense with a list of co-conspirators and of 75 interstate wires it intends to introduce at trial.  In light of the foregoing, there can be no colorable argument that defendants have insufficient information to "prepare for trial, to prevent surprise, and to interpose a plea of double jeopardy should [they] be prosecuted a second time for the same offense."  *United States* v. *Bortnovsky*, 820 F.2d at 574.[30]

Taking in turn each of the defendants' requests in their motion shows that the defendants are already in possession of the information to which they are entitled.  With respect to requests 1, 2, and 3, defendants seek information concerning the legislative proposals and legislation supported by Dean Skelos, and the initiatives opposed by Dean Skelos, in connection with the scheme involving Developer-1.  More than ample information has been provided to the defense on this subject.  For example, the Complaint specifically identifies particular legislation by name and bill number that Dean Skelos supported in favor of Developer-1 during the course of the scheme and the dates on which he took action:

- The Developer-1 Lobbyist and CW-1 personally lobbied DEAN SKELOS in connection with Senate Bill S5856-2011, the "Rent Act of 2011," which was introduced by DEAN SKELOS . . .

- Developer-1 lobbied the Senate in connection with Senate Bill S6472-2011 . . .  On or about June 5, 2012, DEAN SKELOS voted in favor of the bill.

- Developer-1 lobbied the Senate in connection with Senate Bill S2320-2013 . . .  On or about January 23, 2013, DEAN SKELOS voted in favor of the bill.  The Governor signed

---

[30]  The Government has also agreed to provide defense with all Jencks Act and *Giglio* material by October 16, 2015, one month before trial, which means any information they are currently lacking they will have with more than ample time to defend themselves at trial.  *See United States* v. *Columbo*, No. 04 Cr. 273, 2006 WL 2012511, at *6 (S.D.N.Y. July 18, 2006) (denying bill of particulars in a case with voluminous discovery because the defendants had time before trial to review the discovery).

the bill into law on or about January 30, 2013.

- Developer-1 lobbied the Senate in connection with Senate Bill S5247-2013. . . .  On or about June 21, 2013, DEAN SKELOS voted in favor of the Bill.

The discovery provided to the defense provides them with even further detail.  For example, the Government has produced emails from Developer-1 in which Developer-1's employees and lobbyists discuss the legislative proposals and legislation they are seeking and their interactions with Dean Skelos concerning those official actions.  Numerous pertinent emails on this subject are highlighted for the defense in the Government's wiretap and search warrant affidavits.  The Developer-1 emails also discuss legislative initiatives adverse to Developer-1 rebuffed by Dean Skelos including, among other things, initiatives adverse to Developer's positions with respect to real estate legislation as well as with respect to campaign finance reform initiatives.  The Government has also identified in the Rule 16 discovery materials legislation and legislative proposals the Government presently intends to introduce at trial and done so in folders making them easily identifiable as such.  *See United States* v. *Vaughn*, No. 10 Cr. 233 (CM), 2010 WL 3025648, at \*2 (S.D.N.Y. July 27, 2010) (explaining that "if the information the defendant seeks is provided in the indictment or in some acceptable alternate form, such as discovery, no bill of particulars is required") (quotation omitted).

With respect to request 4, the defendants seek information concerning how Dean Skelos assisted the Environmental Technology Company with respect to fracking regulations.  Among other places, the Complaint describes the steps taken by Dean Skelos in advising Abtech with respect to fracking in New York, directing his staff to receive and review Abtech materials related to fracking, and directing his staff, including his Chief of Staff, to arrange a meeting between Abtech and the New York Department of Health ("DOH").  (*See, e.g.* Compl. ¶ 44 (a)-(c)).  In discovery, the Government has produced public statements made by Dean Skelos in

94

favor of fracking as well a copy of the legislation Dean Skelos previously supported in favor of a fracking moratorium, a position he then abandoned by the time Adam Skelos was being paid by the Environmental Technology Company.  The Government has also produced emails from the DOH (in a folder labeled "NY Department of Health") and from the Chief of Staff (in a folder labeled by the Chief of Staff's name) with emails related to Dean Skelos arranging the meeting between DOH and the Environmental Technology Company.  The Government also produced emails from the New York State Senate on the same subject.  *See, e.g.*, *United States* v. *Reinhold*, 994 F. Supp. 194, 201 (S.D.N.Y. 1998) (denying request for bill of particulars where the "indictment is detailed in its allegations" and the "defendants have had extensive discovery").

With respect to requests 5 and 6, the Complaint and the T-III Affidavits describe in great detail the steps taken by Dean Skelos to attempt to secure changes to New York State's 2015-2016 budget, including by seeking funding for stormwater infrastructure—through advocating for such changes publicly, to his staff, and to other public officials—as well as supporting authorization for design-build contracts by agreeing to enact the legislation if it were supported by the Governor.  (*See, e.g.*, Compl. ¶¶ 46-50, 52-57).  The T-III linesheets and periodic reports highlight numerous specific intercepted communications related to these efforts as well as the Government's interpretations of those communications.  The Government also produced emails from the New York State Senate (in a "NYS Senate" folder) in which Dean Skelos's staff was negotiating for design-build and stormwater funding as part of the budget.  The fact that certain witnesses stated, in sum and substance, that they did not observe Dean Skelos taking any steps in furtherance of these legislative proposals, does not mean any such steps did not take place.  In fact, the defense is in possession of abundant evidence in discovery showing that Dean Skelos did in fact attempt to secure changes to New York State's 2015-2016 budget as alleged in the

95

Complaint and in the Superseding Indictment.  *See, e.g.*, *United States* v. *Machado*, 986 F. Supp. 2d 288, 293 (S.D.N.Y. 2013) (denying bill of particulars where "[d]iscovery includes nearly four thousand audio recordings of intercepted calls with searchable line sheets of the calls identifying participant, date, and time of the calls, recordings of undercover purchases of narcotics, tracking and search warrant applications, and laboratory reports"); *United States* v. *Pacheco*, 902 F. Supp. 469, 475 (S.D.N.Y. 1995) (denying request for bill of particulars because "the charges are adequately set forth in the indictment, the criminal complaint, and in discovery").

With respect to request 7, the defendants seek information concerning the legislation which Dean Skelos supported as part of the Malpractice Insurance Administrator scheme.  As specified in the Superseding Indictment, Dean Skelos voted for legislation in 2012 and 2015, which prevented New York State from liquidating malpractice insurers like the Malpractice Insurance Administrator.  (*See, e.g.*, Superseding Indictment ¶¶ 27(h)).  In discovery, the Government has produced copies of the legislation referenced in the Superseding Indictment and other legislation that it may introduce at trial as well as emails from the Malpractice Insurance Administrator's lobbyists discussing the legislation.

With respect to requests 8 and 9, the defendants seek information concerning actions taken by Dean Skelos to facilitate the approval of the Environmental Technology Company's Nassau County contract and to pressure Nassau County to make payments and obtain additional funding.  The Complaint highlights the particular dates on which Dean Skelos spoke to the Company about obtaining the Nassau County contract and dates on which he contacted County officials about the Company's contract.  (*See, e.g.* Compl. ¶¶ 35-37, 39-43).  Indeed, the Government quotes from one particular intercepted communication in which Dean Skelos, using coded language, pressures the Nassau County Executive to make payment for the Company

96

followed by a phone call to convey as much to Adam Skelos. The Complaint also summarizes the sum and substance of other communications between Dean Skelos and Nassau County officials. In discovery, the Government has provided the defendants with the relevant wiretap recording in which Dean Skelos contacted the Nassau County Executive as well as the Government's interpretation of the communication. The Government also has produced recordings in which Adam Skelos describes to others his father's contacts with Nassau County officials. These calls are highlighted in the linesheets and in selected T-III Affidavits and the T-III Periodic Reports. In addition, the Government has produced emails from the Environmental Technology Company, with subfolders labeled "Nassau County" and "Skelos," which contain communications concerning the actions the Company was seeking with respect to the contract and the defendants' actions in connection with the contract. *See United States* v. *Conesa*, 899 F. Supp. 172, 176 (S.D.N.Y. 1995) (denying request for bill of particulars because "[t]he Indictment sufficiently advises defendants of the specific acts of which they are accused" and "the Government . . . has made available to defense counsel extensive discovery that supplements the information provided in the . . . Indictment").

With respect to requests 10 and 11, the defendants seek information concerning Dean Skelos's pressure on Developer-1 to obtain payments for Adam Skelos and the statements made by Dean Skelos that he would take detrimental action against developers who did not support him. And with respect to request 12, defendants seek information concerning the Government's allegation that Dean Skelos "fostered the expectation" that he would take official action favorable to and would refrain from taking official action to the detriment of Developer-1 and the Environmental Technology Company. The Complaint identifies by date the meetings between Dean Skelos and Developer-1's representatives during which Dean Skelos repeatedly

97

requested that Developer-1 arrange for payments to Adam Skelos, including during meetings when Developer-1 was lobbying Dean Skelos with respect to legislation critical to its business. (*See, e.g.*, Compl. ¶¶ 26-29). The Complaint describes, based on interviews with CW-1, among other things, the statements that Dean Skelos made during these meetings to place pressure on Developer-1 to pay Adam Skelos. The Complaint also describes, among other things, various actions Dean Skelos took for the benefit of the Environmental Technology Company and a threat conveyed to the Company that he would act against their interests if Adam Skelos was not paid additional sums. Moreover, by October 16, 2015, one month before trial, the defendants will receive all the Jencks Act material for these witnesses, including their statements about Dean Skelos's statements at meetings with representatives of Developer-1 and the Company.[31]

Finally the defendants argue the Government should be required to identify the documents and communications that support its allegations. The Government has produced the evidence it may introduce at trial and methodically organized the discovery for the defense's review. And last week the Government provided the defense with a list of 75 interstate wires it intends to introduce at trial. The Government is not required to provide the defense with its exhibit list or Jencks Act material at this stage as the defendants are in possession of more than sufficient evidence to "prepare for trial, to prevent surprise, and to interpose a plea of double jeopardy should [they] be prosecuted a second time for the same offense." *Bortnovsky*, 820 F.2d at 574; *see also United States* v. *Percevault*, 490 F.2d 126, 129 (2d Cir. 1974) (Rule 16 "was intended to permit the defendant liberal discovery only of *his own* statements in the

---

[31]   With respect to request 13, the defendants seek information concerning any threats made by Dean Skelos and Adam Skelos to the Environmental Technology Company. In the Complaint, the Government provided the defendant with the email threat and summary of the oral threats. (*See, e.g.*, Compl. ¶ 31). The defendants were then provided in discovery with the actual email itself as well as the surrounding follow-up communications and phone records.

government's possession." (emphasis added)); *In re United States*, 834 F.2d 283, 287 (2d Cir.1987) ("[W]e hold that, as to the district court's order for the production of statements of government witnesses, the Jencks Act controlled, and the district court had no inherent power to modify or amend the provisions of that Act." (citations omitted)).[32]

## CONCLUSION

For the reasons set forth above, the Government respectfully requests that the Court deny the defendants' motion in its entirety.

Dated:   September 25, 2015
         New York, New York

                                        Respectfully submitted,

                                        PREET BHARARA
                                        United States Attorney

                        By:            /s/

                                        Jason A. Masimore/Rahul Mukhi/
                                        Tatiana R. Martins/Thomas A. McKay
                                        Assistant United States Attorneys

---

[32]   Given the Government's charging instruments and discovery identify the victims of the alleged substantive extortion counts, the defendants' co-conspirators, and the particular transactions at issue, among other particulars, the cases relied upon by the defense are inapposite. *See* (Def. BOP Mot. 4 (citing *United States* v. *Davidoff*, 845 F.2d 1151, 1154-55 (2d Cir. 1988) (indictment alleged RICO conspiracy over the course of seven years and failed to disclose victims of extortion schemes); *United States* v. *Rajaratnam*, No. 09 Cr. 1184 (RJH), 2010 WL 2788168, at *2 (S.D.N.Y. July 13, 2010) (insider trading charges spanning six years and involving dozens of stocks, dozens of co-conspirators, and a total of seven conspiracies as charged in the indictment)). Moreover, although the Government has produced extensive discovery, it has done so in an organized fashion, which courts have relied on in denying bill of particulars requests. *See United States* v. *Huntress*, No. 13-CV-199S, 2015 WL 631976, at *29 (W.D.N.Y. Feb. 13, 2015) ("[T]he organized production of discovery, when coupled with the detailed allegations of the 27–page Indictment, provides defendants with a sufficient roadmap of the charges against them to enable them to prepare for trial and to prevent surprise.") (citing *United States* v. *Ferguson*, 478 F. Supp. 2d 220, 227 (D. Conn. 2007) ("Given the degree of detail in the indictment and the government's provision of searchable discovery databases and a list of its key documents, the defendants have not proven that they require more particularization to adequately prepare their defenses, avoid prejudicial surprise at trial, and protect against future double jeopardy.").